626 F.2d 917

**NATIONAL WILDLIFE FEDERATION, Appellant,**

**v.**

**The UNITED STATES of America, et al.**

**No. 78-1976.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1979.

Decided Feb. 11, 1980.

Peter C. Kirby for appellant.

Anne S. Almy, Atty., Dept. of Justice, with whom James W. Moorman, Asst. Atty. Gen., Earl J. Silbert,* U. S. Atty., Cameron M. Blake, Asst. U. S. Atty., Robert L. Klarquist and James T. Draude, Attys., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before McGOWAN and LEVENTHAL,** Circuit Judges, and PENN,*** United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This appeal is from the District Court's dismissal of a suit requesting declaratory relief and mandamus[1] against the President of the United States and the Director of the Office of Management and Budget. At issue is the adequacy *vel non* of certain disclosures and explanations accompanying the President's proposed fiscal 1979 budget in light of section 8(b) of the Forest and Rangeland Renewable Resources Planning Act, 16 U.S.C. § 1606(b) (1976). For the reasons set forth below, we think the District Court properly declined to provide the relief sought. We therefore affirm.

---

\* United States Attorney at the time the brief was filed.

\*\* Circuit Judge Leventhal was a member of the panel which considered this case but died before the opinion was issued.

\*\*\* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. Despite some suggestion in appellant's brief that an *injunction* is sought here, *see, e. g.,* Brief for Appellant at 5, 36–37, we treat appellant's prayer for relief as one requesting *man-*

*damus.* An action purportedly requesting a mandatory injunction against a federal official is analyzed as one requesting mandamus. *See McQueary v. Laird,* 449 F.2d 608 (10th Cir. 1971); *Marquez v. Hardin,* 339 F.Supp. 1364 (N.D.Cal.1969); 28 U.S.C. § 1361 (1976). *See also Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958); P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 1384–85 (2d ed. 1973) [hereinafter cited as Hart & Wechsler].

## I

### THE STATUTORY FRAMEWORK

The Forest and Rangeland Renewable Resources Planning Act of 1974, Pub.L.No. 93-378, 88 Stat. 476, *as amended* (the Act), requires the President and the administration to develop what is, in effect, a master plan for the management and use of forests and rangelands. *See* 16 U.S.C. §§ 1601–06 (1976). The master plan is highly multifarious. Its components include a "Renewable Resource Assessment," *id.* § 1601, a "Renewable Resource Program," *id.* § 1602, a system of "annual reports," *id.* §§ 1606(c), 1601(d), 1602(e), a presidential "Statement of Policy," *id.* § 1606, and various presidential "budget statements," *id.* To understand the gravamen of this lawsuit, it is necessary to describe in some detail the purposes and elements of each component of the master plan.

### A. The "Renewable Resource Assessment"

The Act requires that a "Renewable Resource Assessment" (the Assessment) be prepared by the Secretary of Agriculture. The first Assessment was prepared in 1976. The Assessment is to be updated in 1979, and every tenth year thereafter. *Id.* § 1601(a). The Assessment, *inter alia*, must:

(1) analyze the present and anticipated uses and demand for, and supply of, renewable resources, *id.* § 1601(a)(1);

(2) inventory renewable resources and evaluate the ways of, and costs associated with, increasing the "yield of tangible and intangible goods and services" from these resources, *id.* §§ 1601(a)(2), 1601(b)(1), 1603, taking into account the possible application of new technology, *id.* § 1601(b)(3);

(3) describe Forest Service programs, *id.* § 1601(a)(3);

(4) discuss any factors that would alter existing patterns of use or management of forests and rangelands, *id.* § 1601(a)(4); and

(5) report on the prospects for increased conservation by recycling wood wastes, *id.* § 1601(b)(2).

### B. The "Renewable Resource Program"

The Act also requires the Secretary of Agriculture to prepare and submit to the President a "Renewable Resource Program" (the Program) for the protection, management and development of the National Forest System. The first Program was due in 1975; the Secretary must update it every five years. Specifically, the Program must discuss, *inter alia*:

(1) developing forest roads and trails, *id.* § 1602;

(2) Forest Service programs and their goals, *id.* §§ 1602, 1602(5)(A);

(3) appropriate areas of research, *id.* § 1602;

(4) desirable public and private investments, *id.* § 1602(1);

(5) priorities for accomplishing goals, *id.* § 1602(3);

(6) probable personnel requirements, *id.* § 1602(4); and

(7) the impact of timber export and import on supplies and prices, *id.* § 1602(5)(E).

As part of the Renewable Resource Program, the Secretary of Agriculture also must develop "land management plans" for each area in the National Forest System. These plans must, *inter alia*, specify the amount and manner in which timber may be cut. *Id.* § 1604.

### C. The Annual Reports

In addition to the Assessment and the Program, the Act requires the Secretary of Agriculture to issue several varieties of annual reports. One annual report must:

(1) describe the status and findings of major research projects, *id.* § 1606(c); and

(2) discuss in "quantitative and qualitative terms" the "progress in implementing the Program . . . together with accomplishments of the Program as they relate to the objectives of the Assessment" taking into account the "balance between economic factors and environmental quality factors." *Id.* § 1606(d).

This report must be written "in concise summary form." *Id.* § 1606(f).

The Act requires that a second variety of annual report be prepared by the Secretary of Agriculture. This report must describe the amount and location of National Forest system land that needs reforestation, *id.* § 1601(d)(1), and the approximate amount of money required each year systematically to replant this land, *id.* § 1601(d)(2). *See also id.* § 1607.

A third required annual report must discuss the benefits and possible harms of using various herbicides and pesticides in the National Forest System. *Id.* § 1601(e).

### D. The "Statement of Policy"

In addition to these various documents and reports, the President is required to submit a "Statement of Policy" to Congress "to be used in framing budget requests by that Administration for Forest Service activities." *Id.* § 1606(a). The Statement of Policy must accompany each revision of the Assessment and the Program. *Id.* The Statement of Policy apparently is intended to reflect the administration's future plans for Forest Service programs and activities in light of the Assessment and the Program. Either House of Congress may disapprove the Statement of Policy within 90 days of its issuance. Congress also may modify the statement by conventional legislation. *Id.*

### E. The Budget Statements

The final document required by the Act is designed to tie together the numerous reports and studies described above. Each year the President is required to submit, with the Forest Service budget request, a statement "express[ing] in qualitative and quantitative terms the extent to which the programs and policies projected under the budget meet the policies approved by the Congress." [2] Should the proposed budget

fail to meet these policies, the Act states that the President "shall specifically set forth the reason or reasons for requesting the Congress to approve the lesser programs or policies presented" (the Statement of Reasons). *Id.* § 1606(b).

### II

### THE RESPONSE OF THE EXECUTIVE BRANCH TO THE ACT

President Ford on March 2, 1976, transmitted to Congress the Statement of Policy required by the Act. The Statement of Policy revealed the intention, subject to other budget constraints, to propose Forest Service budgets adequate to fulfill the recommendations of the Program. Congress neither disapproved nor modified this Statement of Policy.

We have seen that the Act requires the President, in submitting the proposed annual budget, (1) to "express in qualitative and quantitative terms" the extent to which the proposed budget is consistent with the Statement of Policy, and (2) to "set forth the reason or reasons for requesting the Congress to approve the lesser programs or policies presented" in the budget. 16 U.S.C. § 1606(b). These requirements underlie this lawsuit.

### A. The Fiscal 1979 Budget Process

President Carter submitted the proposed fiscal 1979 budget to Congress on January 20, 1978. The President proposed a $1.8 billion budget for the Forest Service. A budget that included all the money envisioned by the Program would have totalled about $2.4 billion. The budget report noted, correctly, that "the proposed budget for the Forest Service is considerably less than that suggested by the reports prepared pursuant to the Resources Planning Act." [3] The Forest Service the same day transmitted to Congress a document entitled *Ex-*

---

**2.** 16 U.S.C. § 1606(b). The "policies approved by the Congress" are those reflected in the President's Statement of Policy. The Statement of Policy is deemed ratified by Congress if

neither chamber disapproves it within 90 days of its issuance. *Id.* § 1606(a).

**3.** The Budget of the United States Government, 1979, at 123.

*planatory Notes*, which stated, in pertinent part:

> The President's goal is to balance the Federal budget by 1981 and to hold Federal employment to minimum levels. To meet this goal, decisions must be made now which identify programs which are not of the highest priority and which propose the necessary action to reduce and/or eliminate these programs. The Forest Service operates a large and aggressive program including the Young Adult Conservation Corps and Job Corps programs, and will accomplish the highest priority work within these capabilities and fiscal policy. The fiscal year 1979 budget reflects this effort, and while the budget is somewhat less than fiscal year 1978, it is considerably more than fiscal year 1977.

*Explanatory Notes* at 7.

House and Senate appropriations subcommittees held hearings on the proposed Forest Service budget during March and April, 1978. At the hearings, subcommittee members asked for, and obtained, figures disclosing the differences between the budget requests and the amounts needed fully to achieve the goals of the Program. *See Department of Interior and Related Agencies Appropriations for 1979: Hearings Before a Subcomm. of the Senate Comm. on Appropriations*, 95th Cong., 2d Sess. *passim* (1978); *Department of Interior and Related*

*Agencies Appropriations for 1979: Hearings Before a Subcomm. of the House Comm. on Appropriations*, 95th Cong., 2d Sess. *passim* (1978) [hereinafter cited as *House Hearings*]. Various legislators criticized the proposed budget as excessively penurious in light of the. Program's recommendations. At no time during the hearings, however, did a legislator or witness assert that the President had failed to comply with section 1606(b) in any respect.

The National Wildlife Federation on April 28, 1978, sent a letter to President Carter.[4] The letter argued, *inter alia*, that he had not complied with section 1606(b). The letter asked the President promptly to supply an adequate Statement of Reasons for recommending lesser Forest Service funding. The President apparently neither replied to the letter nor offered any further explanation of the proposed budget.

The House passed the Forest Service appropriations bill on June 21, 1978. The Senate passed a similar bill on August 9, 1978. Each chamber approved the conference report. The President signed the bill October 17, 1978.

The cyclical budget process began again in January, 1979, with the President's submission of a proposed budget for fiscal 1980. The proposed budget included a new Statement of Reasons required by the Act.[5]

---

**4.** A copy of the letter was sent to each member of the House and Senate appropriations committees.

**5.** The 1980 budget statement provides, in pertinent part:

> Total outlays for the mission of conservation and land management are estimated to decrease from $2.0 billion in 1979 to $1.7 billion in 1980 largely because of reductions in national forest administration and in conservation of agricultural lands.
>
> *Management of national forests and forestry research.*—The Forest Service administers the national forest system, covering 188 million acres; conducts a comprehensive forest and range research program; and carries out cooperative forestry programs with States and private landowners. Proposed 1980 budget authority for these activities totals $1,490 million, a decrease of $272 million

from 1979. However, the 1980 program level will be about $50 million more than in 1977.

> The largest proposed reduction ($161 million) is in the costs of administering the national forests, including the timber sales program and related road construction, construction of facilities, reforestation, and stand improvement. These reductions are partially offset by modest increases in fish and wildlife management, administration of minerals development, and other activities.
>
> Other reductions are proposed for research and cooperative forestry programs. The 1980 budget proposes no funds for grants to States for forest fire control. The objective of this program has been accomplished, since all States now have established forest fire control programs.
>
> The 1980 budget also provides no funds for the Youth Conservation Corps in 1980. While this is a popular program providing summer employment for youths, it is not

## B. *The Lawsuit*

Meanwhile, on June 8, 1978, appellant filed this suit asking for mandamus [6] and declaratory relief. The suit alleged two violations of section 8(b) of the Act, 16 U.S.C. § 1606(b) (1976). It asserted, first, that the President had failed to comply with the requirement that the budget request "express in qualitative and quantitative terms the extent to which the programs and policies projected under the budget" fall short of the plans established by the Statement of Policy accepted by Congress. Second, the suit alleged that the President had failed adequately to set forth the "reason or reasons for requesting the Congress to approve the lesser programs or policies." The essence of appellant's contention on this count is that although a reason was given for proposing a *total* budget of lesser magnitude than that envisioned by the Program, no reasons were given for favoring certain components of the Forest Service budget over others.[7]

targeted to the needy or to the basic underlying causes of unemployment. The Corps performs useful work, but much of it is not essential to the maintenance of our public lands or can be accomplished at a lower cost by other means. The recommendation to close this program is made for these reasons, because of the need for strict fiscal restraint, and in light of the overall program of youth employment and training discussed in the section on education, training, employment, and social services.

The proposed budget for the Forest Service is sufficient to meet high-priority program needs. Timber sale offerings are planned at 11.7 billion board feet in 1980—the estimated maximum that can presently be sold economically and in an environmentally acceptable manner from national forest lands. Funds are proposed to permit the reforestation of 187,000 acres and for timber stand improvement on 179,000 acres. This is an addition to reforestation of harvested areas financed by receipts from timber purchasers. Proposed funding for wildlife and fish management will assure protection to these important resources; funds for recreational use of the national forests and other activities are provided at somewhat lower levels than in 1979.

Because of the need for fiscal restraint, most Forest Service activities are not proposed at the levels recommended in the program transmitted by the former Secretary of Agriculture in 1976 pursuant to the Forest and Rangeland Renewable Resources Planning Act of 1974. The 1980 budget is, however, consistent with the statement of policy transmitted at that time, which noted that additional evaluation of those recommendations would be necessary to support the program, and that the recommendations should be considered in the context of total Federal priorities and the overall size of the budget. The administration is conducting further planning and evaluation as the basis for revised recommendations required in calendar year 1980 under the 1974 Act.

Income realized from logging timber is taxed at rates applicable to long-term capital gains, rather than as ordinary income. This treatment will result in an estimated 1980 tax expenditure of $455 million.

*Management of public lands.*—The Bureau of Land Management administers approximately 417 million acres of public domain land, including about 243 million acres in Alaska. In addition, it manages subsurface rights vested in Federal ownership on another 370 million acres, and has jurisdiction over 1.1 billion acres of the Outer Continental Shelf. In managing these lands, the Bureau strives for an optimal balance among recreation, timber, grazing, mineral development, wilderness, wildlife, and other uses. Revenues collected from mineral leasing, grazing fees, timber sales, land and materiels sales, and rights-of-way leases are estimated at $823 million in 1979 and $837 million in 1980. Outer Continental Shelf receipts are included in the section on undistributed offsetting receipts. Budget authority for the Bureau is proposed to decrease from $435 million in 1979 to $387 million in 1980. Reductions are proposed for facilities construction and several other activities.

Funding recommended for Outer Continental Shelf environmental studies is increased over 1979. Priorities for these studies will be determined primarily by the importance of the study to oil and gas lease sale and lease management decisions, and the magnitude of the potential environmental consequences of those decisions.

The budget proposals continue the emphasis given in 1979 to soil and vegetative inventories, and to environmental studies to support the range management program. They provide for continuing the inventory and review of wilderness areas. Lower priority research and project development activities have been deferred wherever possible.

Brief for Appellee at 31–32.

**6.** *See* note 1 *supra.*

**7.** Appellant also points out that it was not the President himself, but rather various administration officials, that supplied budget information to Congress. We do not deem this to be

Decision of the case was expedited on plaintiff's motion. On July 21, 1978—before the appropriations bill was enacted—the District Court dismissed the complaint. The first count was moot, the court held, because information supplied by administration witnesses during budget hearings fulfilled the "qualitative and quantitative" requirement.

The second count was dismissed for a different reason. The District Court held that no "discernible standards" existed to permit a court to determine whether the President had supplied an adequate Statement of Reasons in requesting lesser appropriations than that envisioned by the Statement of Policy. In the view of the District Court, therefore, the lawsuit raised a non-justiciable political question within the meaning of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

The National Wildlife Federation appealed from each ruling.

### III

Federal courts possess the discretionary power to withhold mandamus and declaratory relief. The exercise of that discretion is appropriate, we think, in light of the facts of this case. We therefore affirm the denial of relief by the District Court without passing upon the adequacy of the President's submissions under the Act.

#### A. *Mandamus*

▇▇▇ Where a federal official has a clear obligation to perform a ministerial duty, a federal district court may issue a writ of mandamus under 28 U.S.C. section 1361 [8] to compel the fulfillment of the obligation. Mandamus is not precluded because the federal official at issue is the President of the United States. *National Treasury Employees Union v. Nixon*, 160 U.S.App.D.C. 321, 492 F.2d 587 (D.C.Cir. 1974).

significant in the context of this case. Appellants concede, as they must, that administration officials present the President's budget policy. A. 66. *See* Exec. Order No. 11541, 35 Fed.Reg. 10737 (1970) (delegating certain budget responsibilities to OMB).

▇▇▇ That the statute *permits* the issuance of mandamus does not *require* its issuance. Mandamus is issued at the discretion of the court. *Hayakawa v. Brown*, 415 U.S. 1304, 1305, 94 S.Ct. 1145, 39 L.Ed.2d 457 (Douglas, Circuit Justice, 1974); *Cartier v. Secretary of State*, 165 U.S.App.D.C. 130, 138, 506 F.2d 191, 199 (D.C.Cir.1974), *cert. denied*, 421 U.S. 947, 95 S.Ct. 1677, 44 L.Ed.2d 101 (1975); *National Treasury Employees Union v. Nixon*, 160 U.S.App.D.C. 321, 350, 492 F.2d 587, 616 (D.C.Cir.1974). *See Kerr v. United States District Court*, 426 U.S. 394, 403, 96 S.Ct. 2119, 2124, 48 L.Ed.2d 725 (1976).

#### B. *Declaratory Judgment*

It is clear beyond cavil that a suit for a declaratory judgment may present a justiciable case or controversy within the meaning of Article III of the Constitution. Judicial discretion exists, nevertheless, to deny declaratory relief.

▇▇▇ The Federal Declaratory Judgment Act, 28 U.S.C. section 2201 (1976), makes clear the discretionary nature of the remedy. The statute provides that in "a case of actual controversy within its jurisdiction," a federal court "*may*" give a declaratory judgment. *Id.* (emphasis added). That this language is intended to permit the court in its discretion to withhold declaratory relief is well established. *E. g., Zemel v. Rusk*, 381 U.S. 1, 19, 85 S.Ct. 1271, 1282, 14 L.Ed.2d 179 (1965); *A. L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 331, 82 S.Ct. 337, 341, 7 L.Ed.2d 317 (1961); *Public Service Commission v. Wycoff Co.*, 344 U.S. 237, 241, 73 S.Ct. 236, 239, 97 L.Ed. 291 (1952); *Geni-Chlor International, Inc. v. Multisonics Development Corp.*, 580 F.2d 981, 985 (9th Cir. 1978); Hart & Wechsler, *supra* note 1, at 132.

8. 28 U.S.C. § 1361 (1976) provides:
 The district court shall have original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff.

### C. *The Public Interest in Offering Discretionary Relief*

 Among the factors to be considered in deciding whether to grant declaratory relief in a particular case is the public interest *vel non* in resolving the controversy.[9] Similarly, the exercise of discretion to issue a writ of mandamus also must be guided by the court's perception of the public interest.[10]

 Sometimes the great public importance of an issue militates in favor of its prompt resolution. *See Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 95–96, 98 S.Ct. 2620, 2642–2643, 57 L.Ed.2d 595 (1978) (Rehnquist, J., concurring) & *id* at 102–03 (Stevens, J., concurring) (contending that the majority ignored powerful jurisdictional and justiciability arguments because it thought it important to consider on the merits the constitutionality of the Price-Anderson Act's liability limitations for nuclear accidents). At other times, however, the public interest dictates that courts exercise restraint in passing upon crucial issues. *See, e. g., Public Affairs Associates, Inc. v. Rickover*, 369 U.S. 111, 112–13, 82 S.Ct. 580, 581–82, 7 L.Ed.2d 604 (1962). We think such restraint is necessary where, as here, appellants ask us to intervene in wrangling over the federal budget and budget procedures. Such matters are the archetype of those best resolved through bargaining and accommodation between the legislative and executive branches.[11] We are reluctant to afford discretionary relief when to do so would intrude on the responsibilities—including the shared responsibilities—of the coordinate branches.[12]

These concerns are intertwined with constitutional and prudential limitations on federal court jurisdiction. Appellant here may lack standing,[13] and this case arguably

9. *E. g., Public Affairs Assocs., Inc. v. Rickover*, 369 U.S. 111, 112–13, 82 S.Ct. 580, 581–82, 7 L.Ed.2d 604 (1962); *Puerto Rico Int'l Airlines, Inc. v. Silva Recio*, 520 F.2d 1342, 1345 (1st Cir. 1975); Hart & Wechsler, *supra* note 1, at 133; *Developments in the Law—Declaratory Judgments 1941–1949*, 62 Harv.L.Rev. 787, 807–08 (1949).

10. Although the remedy by mandamus is at law, its allowance is controlled by equitable principles . . . and it may be refused for reasons comparable to those which would lead a court of equity, in the exercise of a sound discretion, to withhold its protection of an undoubted legal right. . . .

 *The court, in its discretion, may refuse . . to give a [mandamus] remedy which would work a public injury or embarrassment, . . just as in its sound discretion a court of equity may refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest.*

 *United States ex rel. Greathouse v. Dern*, 289 U.S. 352, 359–60, 53 S.Ct. 614, 617, 77 L.Ed. 1250 (1933) (emphasis added). *See National Treasury Employees Union v. Nixon*, 160 U.S. App.D.C. 321, 350, 492 F.2d 587, 616 (D.C.Cir. 1974):

 We [refuse to mandamus the President] at this time in order to show the utmost respect to the office of the Presidency and to avoid, if at all possible, . . . any clash between the judicial and executive branches of the Government.

11. Congressional control over appropriations and legislation is an excellent guarantee that the executive will not lightly reject a congressional request for information, for it is well aware that such a rejection increases the chance of getting either no legislation or undesired legislation.

 *Nixon v. Sirica*, 159 U.S.App.D.C. 58, 136, 487 F.2d 700, 778 (D.C.Cir.1973), *quoting* Bishop, *The Executive's Right of Privacy: An Unresolved Constitutional Question*, 66 Yale L.J. 477, 486 (1957).

12. [R]epeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches. We should be ever mindful of the contradictions that would arise if a democracy were to permit general oversight of the elected branches of government by a nonrepresentative, and in large measure insulated, judicial branch.

 *United States v. Richardson*, 418 U.S. 166, 188, 94 S.Ct. 2940, 2952, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).

13. Appellee purported to waive challenge to appellant's standing. *See* Defendant's Response to Plaintiff's Motion for Advancement. Because standing implicates our jurisdiction under Article III, and also is pertinent to self-imposed prudential limitations on our jurisdiction, this "waiver" is necessarily ineffective.

presents a nonjusticiable political question.[14] Appellees urge with great vigor

However, because we deny on other grounds the relief appellant seeks, we need not decide the issue of appellant's standing. *See* note 16 *infra*. We do, however, note in passing that it is not self-evident that appellant has standing to complain of alleged deficiencies in the President's submissions to Congress with respect to the budget.

14. Appellees argue, and the District Court held, that the adequacy *vel non* of the President's Statement of Reasons presents a nonjusticiable political question within the meaning of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

Appellees urge, with some force, that courts should leave the resolution of this kind of dispute to bargaining, compromise, and accommodation between Congress and the President.

First, the Constitution itself recognizes the important role played by the elective branches in formulating the federal budget. U.S.Const. art. 1, § 9, cl. 7; *id.* art. II, § 3; *see Harrington v. Bush*, 180 U.S.App.D.C. 45, 49–50, 553 F.2d 190, 194–95 (D.C.Cir.1977); *cf. Andrus v. Sierra Club*, 442 U.S. 347, 359, 99 S.Ct. 2335, 2342 & n.18, 60 L.Ed.2d 943 (1979) (discussing the roles of the legislative and executive branches in budget preparation).

Second, Congress possesses various powers of its own with which to indicate to the President that it wants a more complete Statement of Reasons than that initially provided. *See Nixon v. Sirica*, 159 U.S.App.D.C. 58, 136, 487 F.2d 700, 778 (D.C.Cir.1973). For a discussion of Congress' powers in the context of a dispute with the President over the allocation of *constitutional* authority, see *Goldwater v. Carter*, 444 U.S. 996 at 1000, & n.1, 100 S.Ct. 533 at 535 & n.1, 62 L.Ed.2d 428 (1979) (statement of Rehnquist, J., joined by Burger, C. J., and Stewart and Stevens, JJ.); J. Choper, Judicial Review and the National Political Process: A Functional Reconsideration of the Role of the Supreme Court 281–88 (1980).

Third, it arguably will be difficult for a court to determine whether a presidential statement does comply with the Act; in other words, it is not clear that standards exist that enable a court to pass upon the President's compliance. Appellant's counsel told the District Court that he could not specify the form that a valid statement of reasons would take. A. 50. The District Court clearly was troubled by the prospect of ordering the President to submit a more elaborate statement without standards to assess its adequacy. A. 16–17, 57–60, 66–71. *See Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710.

Because we base our disposition of this case on another ground, however, we need not reach the political question issue. *See* note 16 *infra*.

that the case is, in any event, moot.[15] These are not frivolous arguments, but we

15. The fiscal 1979 budget already has been approved and signed by the President. That entire fiscal year now has passed. In fact, a fiscal *1980* Forest Service budget has been proposed, approved by Congress, and signed into law. Nothing this court can do now would enhance (1) Congress' ability knowledgeably to legislate with respect to the 1979 fiscal year, or (2) appellant's ability to influence that legislation. The normal rule under these circumstances is that the case must be dismissed as moot. *E. g., Hall v. Beals*, 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (per curiam).

Appellants contend, however, that this case is not moot for two reasons: first, because it is an issue "capable of repetition, yet evading review," *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); second, because the information sought to be obtained from the President even now would be useful to appellant in assessing future budget requests and in commenting on national forest policy. For the reasons that follow, we think appellant's first contention is without merit. Because we base our decision in this case on other grounds, *see* note 16 *infra*, we need not decide whether the interest articulated in appellant's second contention is adequate to prevent this case from becoming moot.

*"Capable of repetition, yet evading review."* The process of litigation may consume so much time that the march of events overtakes the purposes of the lawsuit. Certain of these kinds of cases will not be held moot because they are "capable of repetition, yet evading review." *Southern Pac. Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). (A closely related principle saves from mootness certain class suits brought on behalf of a changing group of aggrieved individuals. *Bell v. Wolfish*, 441 U.S. 520, 526 n.5, 99 S.Ct. 1861, 1867, 60 L.Ed.2d 447 (1979); *Sosna v. Iowa*, 419 U.S. 393, 399–401, 95 S.Ct. 553, 557–558, 42 L.Ed.2d 532 (1975); *see Gomes v. Rhode Island Interscholastic League*, 604 F.2d 733, 736 & n.5 (1st Cir. 1979). Class certification may prevent a case from becoming moot even though the case is not strictly one "capable of repetition, yet evading review." *See Sosna v. Iowa*, 419 U.S. at 399–400, 95 S.Ct. at 557–558. Because the instant case is not a class suit, the principle developed in this line of cases is inapplicable.)

The "exception" to mootness doctrine for cases "capable of repetition, yet evading review" has arisen, *inter alia*, in lawsuits challenging abortion restrictions, *Roe v. Wade*, 410 U.S. 113, 124–25, 93 S.Ct. 705, 712, 35 L.Ed.2d 147 (1973) (the limitation imposed by the human gestation period provides the "classic justification" for an exception to traditional mootness doctrine), and requirements for political

do not base our decision on any one of them.[16] The cumulative effect of these circumstances does, however, place this dispute in the margin of our authority to adjudicate under Article III, if indeed it is within our adjudicatory authority at all. We are therefore disposed to be cautious in pronouncing upon the adequacy of the President's budget statements under the Act.

We decline the invitation to so pronounce under the circumstances of this case. Our decision is grounded in the discretionary power we possess to withhold mandamus or a declaratory judgment.[17] Exercising that

candidacy, *Moore v. Ogilvie*, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969) (political nomination restrictions present a "continuing controversy" even after the election originally at issue).

Appellant attempts to invoke this principle in the instant case. It is true that, in the future, the President might again respond in an arguably inadequate manner to the Act's disclosure requirements. In that sense, the question of the adequacy of the disclosures is, indeed, an issue "capable of repetition." But there are significant differences between this lawsuit and cases that have applied the "capable of repetition" principle. This lawsuit, unlike those, involves no relatively commonplace event such as pregnancy, or political candidacy. A court may reach the merits of those kinds of cases because the precise situation again may arise with respect to the same party. A "reasonable expectation" that this will occur, *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975), is needed "to justify exercise of the court's remedial powers on his behalf," *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

This case, however, is not of that mold. At issue here is the extraordinary process of budget wrangling between the President and Congress. *See* U.S.Const. art. I, § 9, cl. 7; *id.* art. II, § 3; *Harrington v. Bush*, 180 U.S.App.D.C. 45, 49–50, 553 F.2d 190, 194–95 (D.C.Cir.1977). Although that process occurs each year, there is no guarantee—nor, indeed, even an indication—that the President's future budget submissions under the Act will be deficient. The passage of time under the Act may produce a greater accommodation of the statutory requirements and the President's response to them. For example, the 1980 budget submission, *see* note 5 *supra*, is more elaborate than the 1979 submission, *see* p. —— of 200 U.S. App.D.C., p. 920 of 626 F.2d *supra*. The mootness exception for cases "capable of repetition, yet evading review" requires more than the mere *capability* of repetition. We therefore eschew adjudication where, as here, the possibility of repetition is speculative. *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 187–88, 99 S.Ct. 983, 992–93, 59 L.Ed.2d 230 (1979) (no "reasonable expectation" of recurrence); *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (no "demonstrated probability" that a released convict will again be incarcerated); *Golden v. Zwickler*, 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969) ("wholly conjectural" possibility of repetition). *See also Dean v. Austin*, 602 F.2d 121, 123–24 (6th Cir. 1979).

Thus, because the President's message "reflected neither a policy [he] had determined to continue, nor even a consistent pattern of behavior," *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. at 188, 99 S.Ct. at 992 (citations omitted), this lawsuit cannot be deemed a case "capable of repetition, yet evading review."

*Value of Requested Relief in Assessing Future Budget Submissions.* Appellant contends, nevertheless, that this case is not moot because the information sought to be obtained from the President will be useful in assessing future budget submissions. Appellant argues, in sum, that the process of assessing the President's accountability under the Act did not end with the signing of the 1979 appropriations bill. Because the requested relief may be valuable for this purpose even now, the case is arguably not moot even though monies appropriated for fiscal 1979 are long spent. We need not decide that question today, however, because we deny relief on other grounds. *See* note 16 *infra*.

16. We thus pretermit the complex jurisdictional issues and base our decision on another ground. *See Secretary of the Navy v. Avrech*, 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3040, 41 L.Ed.2d 1033 (1974); *United States v. Augenblick*, 393 U.S. 348, 351–52, 89 S.Ct. 528, 531, 21 L.Ed.2d 537 (1969); *Association of Nat'l Advertisers, Inc. v. FTC*, 201 U.S.App.D.C. 165 at 176 & n.20, 627 F.2d 1151 at 1162 & n.20, (D.C.Cir. 1979) (Leventhal, J., concurring).

17. *See* Sections III–A and III–B *supra*. We recognize, of course, that our refusal to grant mandamus does not preclude the granting of a declaratory judgment. *National Treasury Employees Union v. Nixon*, 160 U.S.App.D.C. 321, 350, 492 F.2d 587, 616 (D.C.Cir.1974); *see Super Tire Eng'r Co. v. McCorkle*, 416 U.S. 115, 121–22, 94 S.Ct. 1694, 1697–98, 40 L.Ed.2d 201 (1974); *cf. Steffel v. Thompson*, 415 U.S. 452, 468–69, 94 S.Ct. 1209, 1220, 39 L.Ed.2d 505 (1974); *Zwickler v. Koota*, 389 U.S. 241, 254, 88 S.Ct. 391, 393, 19 L.Ed.2d 444 (1967). We think, however, that the reasons that prompt us to withhold mandamus in this case also are

discretionary power is appropriate here for several reasons in addition to the serious justiciability questions already noted.

First, no legislator complained that the President's informational submissions violated the Act. The funding levels proposed by the budget received much scrutiny—and much criticism—during the congressional hearings. Some legislators expressed dismay that the *overall budget* was only about 71% of that envisioned by the Program.[18] Legislators also attacked proposed funding reductions for even the most obscure *individual programs.*[19] But no legislator at any time complained that the President had violated the Act by supplying inadequate *information.* No complaint was forthcoming even after the National Wildlife Federation sent to all the appropriations committee members a copy of its letter to President Carter. *See* note 4 and accompanying text *supra.*

The absence of congressional complaints is highly relevant, we think, in light of the Act's purpose. Congress in 1974 was frustrated by President Nixon's impoundment of appropriated funds. *See generally* Congressional Budget and Impoundment Control Act of 1974, Pub.L. No. 93–344, 88 Stat. 297 (codified at 31 U.S.C. §§ 1301–53). The Renewable Resources Planning Act to some extent reflected these sentiments. *See* 16 U.S.C. § 1606(b) (1976). The Act was designed to help legislators understand when, and to what extent, budget requests were inadequate to fulfill policies approved by Congress.[20] In light of the Act's purpose, one would expect that legislators dissatisfied with the President's submissions would have made their dissatisfaction known. Appellant concedes that not one legislator did so.[21]

Second, appellant also concedes that no witness at the appropriations hearings—not even appellant's own witness—complained that the President's submission was inadequate, or that debate was handicapped by

---

18. [Representative] DUNCAN [of Oregon]. [W]e see the FY 1979 budget only reaching 71 percent of those [Program] goals rather than 82 to 100 [per cent] the committee provided in FY 197[8] . . . .. You are taking a step backwards . . . .. I think the record ought to show that the committee supported the [Program] objectives clear across the board. It was not just timber; it was recreation, wilderness, fish and wildlife, soil management, mining, etc. I am personally disappointed with the results of this budget and I have no confidence that the '80 budget will show any improvement.
*House Hearings, supra,* at 635.

19. [Representative] DUNCAN. Decreases of $1.6 million are requested to eliminate the noxious farm weed control program. The tanzi ragwort is very poisonous, and we have an epidemic of it in Oregon. I have difficulty in understanding why you are cutting down that program.
 Mr. THORNTON [of the Forest Service]. The reason is that in the zero-based budget process it did not get the priority.
 * * * * * *
 [Representative] DUNCAN. So what you are telling me is control of the tanzi ragwort in Oregon is going to suffer?

Mr. THORNTON: Yes.
 [Representative] DUNCAN. I want to know what you need in this budget to maintain this program at last year's level and what you need in your judgment, to adequately respond to the need for the eradication of noxious weeds in this country.
*Id.* at 711.

20. "The intent of the legislation is to establish more Congressional control over the management activities and appropriation processes of National Forest System lands." H.R.Rep.No. 1163, 93d Cong., 2d Sess. 1 (1974). *See id.* at 8, 9, 10 & S.Rep.No.686, 93d Cong., 2d Sess. 23–24, 28 (1974), U.S.Code Cong. & Admin.News, p. 4060 (the Nixon administration feared the Act would unduly restrict presidential flexibility and discretion).

21. Brief for Appellant at 14. We do not hold that Congress' uncomplaining appropriation of money in itself affirmed the legitimacy of the President's budget submissions. *See Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 190–91, 98 S.Ct. 2279, 2299, 2300, 57 L.Ed.2d 117 (1978); *Realty Income Trust v. Eckerd,* 183 U.S.App.D.C. 426, 463–464, 564 F.2d 447, 458 & n.38 (D.C.Cir.1977). We do think, however, that the absence of objection by legislators is highly relevant to the decision not to award *discretionary* relief.

relevant to our decision to withhold a declaratory judgment.

the inadequacy of the presidential statement.[22]

Third, we are hesitant to venture to rule on the President's compliance with the Act because this issue may never arise again. As the District Court recognized, passage of time under the Act may produce a greater accommodation of appellant's view of the statutory requirements and the President's response to them. Indeed, this already may have occurred. The President's Statement of Reasons accompanying the proposed 1980 budget is more elaborate than that accompanying the 1979 budget. *Compare* 1980 Statement, *supra* note 5, *with* 1979 Statement, p. 7 *supra*. Moreover, the Assessment, Program, and Statement of Policy all have been newly revised during the pendency of this appeal, or are in the process of being revised. 16 U.S.C. §§ 1601(a), 1602, 1606(a). This controversy never will recur unless future budget statements diverge from the plans envisioned by the updated versions of these documents. That it is wholly speculative that this dispute will arise again militates against awarding discretionary relief.[23]

We think for all these reasons that it would be improvident, on the record before us, to afford mandamus or a declaratory judgment. We therefore ground our affirmance of the District Court's decision on the discretionary power federal courts possess to withhold such relief. Accordingly, we do not assess the adequacy of the President's submissions under the Act.[24]

*It is so ordered.*

22. Brief for Appellant at 14. The record reveals, also, that appellant failed to complain about the adequacy of the President's submissions in its own newsletter. One issue of the newsletter, entitled *Conservation Report from the National Wildlife Federation*, was published within one month of the issuance of the President's proposed budget. It discussed the proposed Forest Service budget in some detail. The newsletter at no point, however, expressed dissatisfaction with the President's submissions under the Act. *See* Plaintiff's Exhibit D at 24–26.

23. "[S]ound discretion withholds the remedy where it appears that a challenged 'continuing practice' is, at the moment adjudication is

sought, undergoing significant modification so that its ultimate form cannot be confidently predicted." *A. L. Mechling Barge Lines, Inc. v. United States*, 368 U.S. 324, 331, 82 S.Ct. 337, 341–42, 7 L.Ed.2d 317 (1961).

24. This decision does not prejudice the right of appellant, or any one else, to challenge the adequacy of the President's submissions with respect to future proposed budgets. *See, e. g., Baker v. Carr*, 369 U.S. 186, 236–37, 82 S.Ct. 691, 720, 7 L.Ed.2d 663 (1962) (discretionary denial of relief is nonprecedential), *quoting Cook v. Fortson*, 329 U.S. 675, 678 n.8, 67 S.Ct. 21, 22 n.8, 91 L.Ed. 596 (1946).