UNITED TRANSPORTATION
UNION, Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents,

Association of American
Railroads, Intervenor.

No. 88–1773.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 18, 1989.
Decided Nov. 28, 1989.

Gordon P. MacDougall, for petitioner.

Evelyn G. Kitay, Atty., I.C.C., with whom Robert S. Burk, General Counsel, Henri F. Rush, Deputy General Counsel, I.C.C., James F. Rill, Asst. Atty. Gen., Catherine G. O'Sullivan, Atty., Dept. of Justice, Washington, D.C., were on the joint brief, for respondents.

Kenneth P. Kolson, Vienna, Va. and Dennis W. Wilson were on the brief, for intervenor. G. Paul Moates, Washington, D.C., David M. Levy and J. Thomas Tidd, Washington, D.C., also entered appearances for intervenor.

Before RUTH BADER GINSBURG, SILBERMAN and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Opinion concurring in denying the petition for review filed by Circuit Judge RUTH BADER GINSBURG.

SILBERMAN, Circuit Judge:

This is a petition brought by the United Transportation Union ("UTU"),[1] seeking review of the Interstate Commerce Commission's ("ICC") decision to adopt a rule that exempts the officers and directors of certain rail carriers from obtaining prior approval for interlocking directorates under 49 U.S.C. § 11322(a). *See Exemption from 49 U.S.C. 11322(a) for Certain Interlocking Directorates,* 5 I.C.C.2d 7 (1988). We hold that the petitioner lacks standing,[2] and therefore dismiss the petition for review.

I.

In the Staggers Rail Act of 1980,[3] Congress gave the ICC broad responsibilities for deregulating the nation's railroads. One section of that Act, 49 U.S.C. § 10505, directs the ICC to exempt a transaction or class of transactions from regulation when the Commission finds that (1) regulation is not necessary to carry out the 15–factor national rail transportation policy (RTP) ar-

---

1. This case was originally brought by Patrick Simmons, the Illinois Legislative Director of the UTU, under his own name. Since Simmons does not even have putative standing as an individual and since subsequent submissions indicate that he actually represents the UTU, we have changed the name of the case.

2. For a union to have standing to represent its members under *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 3441, 53 L.Ed.2d 383 (1977), it must show that (1) union members would otherwise have

standing to sue in their own right; (2) that the interests being asserted are germane to the union's purpose; and (3) that individual members' participation is not needed for the claim asserted or for the relief requested. Because we find that no union member would have standing to bring this challenge, we do not discuss the second and third requirements.

3. Pub.L. No. 96–448, 94 Stat. 1895 (codified at 49 U.S.C. §§ 10101–11917).

ticulated in 49 U.S.C. § 10101a;[4] and (2) either (a) the transaction is of limited scope, or (b) regulation is not needed to protect shippers from the abuse of market power. The legislative history of 49 U.S.C. § 10505 indicates that Congress expected the ICC to use its exemption authority to remove "as many as possible of the Commission's restrictions on charges in prices and services by rail carriers ... and ... adopt a policy of reviewing carrier actions after the fact to correct abuses of market power." H.R.REP. No. 1430, 96th Cong., 2d Sess. 105, *reprinted in* 1980 U.S.CODE CONG. & ADMIN.NEWS 3978, 4110, 4137. *See also Illinois Commerce Comm'n v. ICC,* 848 F.2d 1246, 1249 (D.C.Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989).

Pursuant to that congressional direction, the ICC published, in April of 1988, a notice of proposed rulemaking that would exempt all interlocking directorates between two railroads—except those involving two "class I" railroads[5]—from complying with the requirements of 49 U.S.C. § 11322(a). *See Certain Interlocking Directorates; Exemption,* 53 Fed.Reg. 12,443 (1988). Section 11322(a), originally enacted as part of the Transportation Act of 1920, ch. 91, § 439, 41 Stat. 496 (1920), prohibits any person from serving as a director or officer of more than one rail carrier *unless* the ICC has determined that "public or private interests will not be adversely affected."[6] The proposed rule—by replacing the case-by-case approval system with blanket approval—was designed to eliminate the expense and delay accompanying individual applications. Since the ICC had not rejected an application for an interlocking directorate in nearly twenty years and since no decision to approve an application had ever been challenged by any party, the ICC viewed prior approval as unnecessary. After receiving comments on the proposed rule, including those submitted by the petitioner, the Commission adopted the rule. *See Exemption from 49 U.S.C. 11322(a) for Certain Interlocking Directorates,* 5 I.C.C.2d 7 (1988).

In its accompanying explanation, the Commission explained its determination that the rule satisfied the requirements for granting exemptions set out in 49 U.S.C. § 10505(a). It first asserted that the exemption promoted several of the fifteen factors that comprise the national rail

---

**4.** Section 10101a provides that:

In regulating the railroad industry, it is the policy of the United States Government—(1) to allow, to the maximum extent possible, competition and the demand for services to establish reasonable rates for transportation by rail; (2) to minimize the need for Federal regulatory control over the rail transportation system and to require fair and expeditious regulatory decisions when regulation is required; (3) to promote a safe and efficient rail transportation system by allowing rail carriers to earn adequate revenues, ... (4) to ensure the development ... of a sound rail transportation system with effective competition among rail carriers and with other modes ... (5) to foster sound economic conditions in transportation ... (6) to maintain reasonable rates where there is an absence of effective competition ... (7) to reduce regulatory barriers to entry into and exit from the industry; (8) to operate ... facilities ... without detriment to the public health and safety; (9) to cooperate with the States on transportation matters ... (10) to encourage honest and efficient management of railroads ... (11) to require rail carriers ... to rely on individual rate increases ... (12) to encourage fair wages and safe ... working conditions ... (13) to prohibit predatory pricing and practices, to avoid undue concentrations of market power and to prohibit unlawful discrimination; (14) to ensure the availability of accurate cost information in regulatory proceedings ... (15) to encourage and promote energy conservation.

**5.** The ICC divides the nation's railroads into three classes according to annual operating revenues for three consecutive years. Class I railroads are the largest carriers; there are only 16 of them but collectively they operate approximately 82 percent of the nation's track mileage, employ 90 percent of the railroad labor force and earn 92 percent of the revenues of the rail industry. There are a total of 484 class II and class III railroads.

**6.** Section 11322(a) provides in full:

A person may hold the position of officer or director of more than one carrier as defined in section 11301(a)(1) of this title only when authorized by the Interstate Commerce Commission. The Commission may authorize a person to hold the position of officer or director of more than one of those carriers when public or private interests will not be adversely affected.

transportation policy, finding that the exemption "minimize[s] the need for federal regulatory control and expedite[s] regulatory decisions [49 U.S.C. § 10101a(2) ]; ensure[s] continuation of a sound rail system [49 U.S.C. § 10101a(4) ]; foster[s] sound economic conditions in transportation [49 U.S.C. § 10101a(5) ]; and encourage[s] honest and efficient management [49 U.S.C. § 10101a(10) ]." 5 I.C.C.2d at 11. The Commission also agreed with the comments that contended that, by enabling new carriers to recruit talented and experienced personnel from existing carriers, the exemption would reduce barriers to entry in the industry in furtherance of 49 U.S.C. § 10101a(7). Finally, it believed that none of the other policy goals listed in 49 U.S.C. § 10101a would be adversely affected by the rule. *See id.* at 12–13.

The ICC then concluded that the rule satisfied both of the two alternative tests of § 10505(a)(2)—that the exemption is of limited scope and that the prior approval requirements of § 11322(a) are not needed to protect shippers from the abuse of market power. Its scope is "limited" because the exemption will not apply to interlocks between two class I carriers and the substantive provisions of § 11322(b), prohibiting certain actions by interlocking officers and directors, are not affected by the rule. And shippers do not need the protection of § 11322(a), according to the ICC, because the small size of class II and class III railroads and the vigorous competition present in the transportation industry made it "highly unlikely for any linkage to succeed in allowing one carrier to dominate or influence the other carrier contrary to the other rail carrier's or shipper's interests." 5 I.C.C.2d at 12. The Commission noted that "no shippers chose to file comments" opposing the rule, thereby suggesting that they did not fear any abuse of market power from interlocking directorates. *See id.* at 14.

The petitioner argues that the ICC's decision is inconsistent with § 10505(a) and that it is arbitrary and capricious. The government challenges petitioner's standing on both prudential and constitutional grounds. Our colleague—apparently of the view that the standing issue is too difficult to resolve—believes we should pass on to the merits without deciding whether we have the constitutional authority to hear the case. To be sure, this court has on occasion followed that course, although not often in recent times, but we are unaware of any case where a panel was criticized for *not* employing that technique; in other words, for assuming its constitutional obligation. Here the parties have briefed the standing issue and we have accordingly done our best to answer the jurisdictional question raised. It is hard to understand why, under these circumstances, it could be thought a judicial virtue not to do so.

## II.

To satisfy the standing requirements of Article III, a complaining party must "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, ... and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (internal quotes and citations omitted). "The injury alleged must be ... distinct and palpable, ... and not abstract or conjectural or hypothetical." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (internal quotes and citations omitted).

■ We are mindful that in analyzing standing issues, we "must accept as true all material allegations of the complaint," *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). This obligation, at least at first blush, might appear to be in tension with the Court's further admonition that an allegation of injury or of redressability that is too speculative will not "suffice to invoke the federal judicial power." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 44, 96 S.Ct. 1917, 1927, 48 L.Ed.2d 450 (1976);

*accord Warth,* 422 U.S. at 507, 95 S.Ct. at 2209. We think this ostensible tension is reconciled by distinguishing allegations of facts, either historical or otherwise demonstrable, from allegations that are really predictions. When considering any chain of allegations for standing purposes, we may reject as overly speculative those links which are predictions of future events (especially future actions to be taken by third parties) and those which predict a future injury that will result from present or ongoing actions—those types of allegations that are not normally susceptible of labelling as "true" or "false." Our authority to reject as speculative allegations of future injuries is well-established. *See Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969).[7] In *Lyons,* the Supreme Court reviewed the claim of an individual who alleged that he had been injured by an unjustified "chokehold" administered to him by a Los Angeles police officer and that he "justifiably fears that any contact he has with Los Angeles Police officers may result in his being choked and strangled to death ..." 461 U.S. at 98, 103 S.Ct. at 1663. The Court dismissed on Article III grounds the complainant's prayer for an injunction forbidding the use of such chokeholds by police officers, finding it unduly speculative that the complainant "was likely to suffer future injury from the use of the chokeholds by police officers." *Id.* at 105, 103 S.Ct. at 1667. The Court asserted that, "to have a case or controversy with the City that could sustain [his claim for an injunction, the complainant] would have to *credibly* allege that he faced a *realistic* threat from the future application of the City's policy." *Id.* at 106–07 n. 7, 103 S.Ct. at 1667–68 n. 7 (emphasis added). On the other hand, we are much less free to reject allegations of existing conditions, of prior

---

7. This principle was recognized by our circuit as least as early as *Harrington v. Bush,* 553 F.2d 190, 208–09 (D.C.Cir.1977) where the court denied standing to a congressman alleging illegal use of funds by the CIA. In an extensive discussion of the standing issues raised by the complaint, we noted that,

> [t]he harm alleged by appellant ... would take place, if at all, at some undetermined time in the future.... As the time span between challenged activity and the resulting harm to a protected interest increases, it becomes more difficult to maintain the credibility of the specific link between the two. If this linkage cannot be demonstrated, the standing claim must fail even if the underlying injury is judicially cognizable. In this case, the harm that is alleged will take place at such a time in the future so as to render any potential injury 'speculative' ...

*Id.* at 208–09 (quoting *Simon,* 426 U.S. at 42–43, 96 S.Ct. at 1926). In *Harrington,* we thus contemplated that a court could (indeed must) reject predictions of future injury that are unduly speculative.

We do not believe that the court's opinion in *International Ladies' Garment Workers' Union ("ILGWU") v. Donovan,* 722 F.2d 795, 810 (D.C. Cir.1983), *cert. denied sub nom. Breen v. ILGWU,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984), obliges us always to credit a complainant's predictions of future injury. There, we found standing for a union challenging the Labor Department's decision to repeal regulations that prevented employers from paying homeworkers subminimum wages. In rejecting the claim that it was unduly speculative whether this alleged injury would be *redressed* by the reimposition of regulations on homeworkers' wages, the court described the alleged injury and simply asserted, without elaboration, that "[w]e must accept these allegations as true for purposes of determining standing." *Donovan,* 722 F.2d at 810 (citing *Warth,* 422 U.S. at 502, 95 S.Ct. at 2207). The allegation that the court accepted as true in that case—that paying subminimum wages to homeworkers will injure factory employees—was not just plausible, it was an application of basic economic logic. Indeed, courts routinely credit analytically identical allegations in garden-variety competitor standing cases. *See, e.g., Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 754, 93 L.Ed.2d 757 (1987); *Investment Company Institute v. Camp,* 401 U.S. 617, 620–21, 91 S.Ct. 1091, 1093–94, 28 L.Ed.2d 367 (1971). The *ILGWU* court was therefore not squarely presented with the problem of whether it must accept allegations of future injury that it finds purely speculative. That a court believes itself bound to credit allegations of future injury that are firmly rooted in the basic laws of economics does not compel us to accept allegations founded solely on the complainant's speculation. Allegations founded on economic principles such as those in *ILGWU* and in competitor standing cases, while perhaps not as reliable as allegations based on the laws of physics, are at least more akin to demonstrable facts than are predictions based only on speculation.

or ongoing actions (including intent).[8] In addition, the extent to which we must credit allegations of the cause of injuries that are already sustained is unclear.[9] But if courts were obligated to credit complainants' predictions of *future* events or injuries, both the "redressability" prong and, in cases alleging prospective injury, the "fairly traceable" prong of the standing inquiry—which are, at bottom, predictions of cause and effect—would be reduced to mere pleading requirements.

■ To decide this case we need not settle the uncertainty concerning our obligation to credit allegations of the cause of existing injuries since, unlike *Simon* and *Warth*, where the plaintiffs had already suffered an alleged injury-in-fact which they attempted to attribute to the official action in question, the alleged injury here is itself purely prospective—the petitioner makes no claim that the ICC's exemption has hurt any union member yet. We must therefore reject any of the petitioner's allegations that we determine to be overly speculative. Moreover, we note that any petitioner alleging only future injuries confronts a significantly more rigorous burden to establish standing. Although "[t]he fact that harm or injury may occur in the future is not necessarily fatal to a claim of standing[,] ... [it can] lessen the concreteness of the controversy and thus mitigate [sic] against a recognition of standing." *Harrington v. Bush*, 553 F.2d 190, 208 (D.C. Cir.1977). When a litigant alleges only future injury, he "must demonstrate a realistic danger of sustaining a direct injury ..." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979). This petitioner's allegation does not even approach this rigorous standard.

The only allegation of injury that we can discern from the petitioner's brief is that railroad workers "stand to be hurt" by the "unauthorized control and manipulation of carriers" and by "the financial wrecking of rail carriers" that will supposedly result from the exemption for interlocking directorates. Although not explicitly set forth, we can surmise that petitioner is asserting that the ICC's new rule will lead to the creation of at least one interlocking directorate that would not have been created but for the exemption from § 11322(a), that one of those additional interlocking directorates will result in some anticompetitive behavior or a railroad bankruptcy that would not have occurred but for the interlocking directorate; and that a member of the United Transportation Union will thereby suffer an injury. We believe that this chain of allegations—no link of which is of the type that we must "accept as true"—is fatally speculative and therefore does not suffice to confer standing.

In the first place, we see no reason—*and the petitioner offers us none*—to credit the proposition that an interlocking directorate involving a class II or class III

---

**8.** Even with these allegations we apparently retain some discretion to reject those that we find unconvincing. Since the *Lyons* Court characterized as "incredible" the past and present facts that the complainant would have had to allege to have Article III standing—"either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, ... or (2) that the City ordered or authorized police officers to act in such a manner," *id.* 461 U.S. at 106, 103 S.Ct. at 1667 (emphasis in original)—we doubt that the Court thought it would be forced to credit such allegations even if the complainant had made them explicitly.

**9.** In *Simon*, for instance, the Court denied standing to low-income citizens and organizations representing them that sought to challenge an IRS rule that they believed prompted hospitals to deny treatment to indigent patients. The Court dismissed the complaint, concluding that the link between the alleged injury and the challenged IRS rule was too speculative and that the injury was not likely to be redressed by a favorable decision. The Court stated that it accepted as true the allegation that the IRS rule "encouraged" hospitals to deny treatment. *See Simon*, 426 U.S. at 42 n. 23, 96 S.Ct. at 1926 n. 23. Nevertheless, if the Court were truly obligated to accept the complaint's allegations of cause of their asserted injury, it would not have ruled, as it did, that, "[i]t is purely speculative whether the denials of service specified in the complaint fairly can be traced to [the IRS's] 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications." 426 U.S. at 42–43, 96 S.Ct. at 1926.

railroad will damage, let alone lead to the "financial ruin" of, a carrier.[10] If this allegation is aimed at the likelihood that an officer or director will act *contrary* to the interests of one of the carriers on whose board he sits, it is not just speculative, it is rather far-fetched. To assume that an officer or director will subvert his own firm or drive it into bankruptcy, even if he also has an interest in another carrier, requires us to assume unrealistically that a single officer or director has either the incentive or the power to destroy his own railroad. In addition, crediting this allegation also forces us to presume illegal activities on the part of the individual acting as an executive for more than one railroad. Any director that would, as petitioner fears, purposely steer one carrier into bankruptcy to bolster the competitive position of another or even sacrifice the interests of one of the carriers for the benefit of the other would almost certainly violate his fiduciary duties to the shareholders of the damaged carrier.[11] Indeed, even if an officer or director had a strong incentive to destroy his own firm, it is preposterous to assume that any corporation—who would surely be aware of the executive's other affiliation—would retain (or hire in the first place) an officer or director who had such an incentive, let alone allow that person to attack the firm from within.

If the petitioner instead is alleging that workers will be injured because of possible anticompetitive collusion of carriers whose directorates are interlocked (which is the classic purpose of prophylactic measures such as § 11322(a)), we think that claim inadequate, primarily because it is wholly speculative whether decreased competition in the railroad industry will harm rather than help UTU members. Theoretically, the ultimate effect of reduced competition on railroad workers—as distinguished from

shippers—is indeterminate. Reduced competition is often associated with decreased output, which could translate into fewer job opportunities and/or lower wages for employees. On the other hand, carriers facing less competitive pressure from other carriers will also face less pressure to cut their costs, including labor costs. *See Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983) ("a union's primary goal is to enhance the earnings and improve the working conditions of its membership; that goal is not necessarily served, and indeed may actually be harmed, by uninhibited competition among employers striving to reduce costs in order to obtain a competitive advantage over rivals.") (footnote omitted); *Adams v. Pan American World Airways, Inc.*, 828 F.2d 24, 27 (D.C.Cir.1987), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988). This indeterminacy is enough to defeat petitioner's standing to claim that the exemption will harm union members by reducing competition—especially when it is considered alongside the other speculative aspects of the chain of allegations.

Even if petitioner could pass over the above hurdles, we would also have to assume that the hypothetical interlocking directorate that facilitated the injurious behavior would not have been formed but for the rule removing the prior approval requirements of § 11322(a). Since the ICC has not rejected any application for the types of interlocking directorates covered by the rule in nearly twenty years, the prior approval procedure seems to have been primarily a nuisance—discouraging applications, if at all, on the basis of bother or expense. While it is possible that the exemption will result in a greater number

---

**10.** Notwithstanding the suggestion of our concurring colleague, *see* Concurring Opinion at 919, this proposition is no more coextensive with the merits of this case than the question of injury-in-fact ever is. To decide the merits, we would have to determine whether the ICC acted arbitrarily and capriciously or contrary to law in adopting the challenged exemption, quite apart from whether that exemption could be

thought ultimately to harm railroad workers. We therefore do not agree that the merits and standing questions "are resolved by the same inquiry." *See id.* at 920.

**11.** We note also that the ICC retains the power to revoke any interlocking directorate that appears to threaten any such extraordinary consequences, *see* 49 U.S.C. § 10505(d).

of interlocking directorates, we see no reason to believe that any links formed after the ICC's new rule are more likely to be mere subterfuges for collusive behavior than were the interlocking directorates formed under the old regime. Thus, even if a railroad with a newly formed interlocking directorate was sabotaged thereby, or if it engaged in collusion, the exemption challenged here might not even constitute "but for" causation. Not only might the interlocking directorate have been approved even without the ICC's blanket exemption from § 11322(a), but whatever hypothetical harm that resulted might have occurred even without the interlocking directorate.

Any one of the factors discussed above might be enough to place the petitioner's allegation in the category of "unadorned speculation," *Simon,* 426 U.S. at 44, 96 S.Ct. at 1927, and therefore to deny standing; taken together, petitioner's claim of injury seems but a shadow in the mist. It fails all three prongs of the standing inquiry; it is highly unlikely that the petitioner will sustain any injury at all; even if an injury were sustained, it is unlikely that it could be fairly traced to the ICC's exemption from the prior approval provisions of § 11322(a); and, since any hypothetical future injury could also occur even in the absence of the challenged ICC rule, a favorable decision from this court would not be "likely" to redress it, *see Gladstone, Realtors v. Village of Bellwood,* 441 U.S.

91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979). *Cf. Center for Auto Safety v. Thomas,* 847 F.2d 843, 882 (D.C.Cir.1988) (*en banc*) (opinion of Silberman, J.) (noting that the injury in fact and causation inquiries often run together when the alleged injury is uncertain to occur at all).[12]

It is suggested nevertheless that the petitioner's allegation must be credited for Article III purposes because Congress, in passing § 11322(a), expressed its belief that interlocking directorates would lead to the financial ruin of rail carriers.[13] We are thus again confronted with an issue that this court has pondered in several recent cases but never definitively settled; what, if any, are the implications for Article III standing purposes of a congressional view of the likely effect of legislation? *See Public Citizen v. FTC,* 869 F.2d 1541, 1549–50 & n. 16 (D.C.Cir.1989); *Dellums v. Nuclear Regulatory Comm'n,* 863 F.2d 968, 978–79 (D.C.Cir.1988); *id.* at 984 (Ruth B. Ginsburg, J., dissenting as to standing).

■ Decisions about Article III standing are decisions about the constitutional boundaries of the federal judicial power. While Congress indisputably may preclude the federal courts from hearing cases that they would be constitutionally permitted to hear, the Congress surely cannot expand the constitutional jurisdiction of the federal courts—in essence, amend the Constitution—merely by legislating. *See Dellums,* 863 F.2d at 978. Rather, the courts must

---

**12.** To be sure, this circuit has allowed labor interests to sue where their alleged injuries have been far from certain, but those decisions are readily distinguishable from this one. In *International Union of Bricklayers v. Meese,* 761 F.2d 798 (D.C.Cir.1985), for example, we found standing for a labor union to challenge INS practices which, they alleged, improperly allowed aliens into the United States who would then perform work that would otherwise have gone to union members. Although the union sought declaratory and injunctive relief to prevent future injury, it was able to point to specific instances where union members had allegedly already been displaced by the INS practice at issue. Accepting the union's factual allegations as true, as it was bound to do, the court found that the alleged injury was not speculative, noting that " '[p]ast wrongs are evidence bearing on whether there is a real and immedi-

ate threat of repeated injury,' . . . [and therefore that] the prospect of injury sometime in the reasonably foreseeable future seems fairly probable." *Id.* at 803 (quoting *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S.Ct. 669, 676, 38 L.Ed.2d 674 (1974)). Compared to the petitioner's allegation here, the union's alleged injury in *Bricklayers* was "positively imminent." *See Center for Auto Safety v. NHTSA,* 793 F.2d 1322, 1341 (D.C.Cir.1986) (Scalia, J., dissenting). There is no evidence or even an allegation here that any interlocking directorate in the railroad industry is currently harming or has ever harmed any railroad worker.

**13.** That Congress may also have been concerned about anticompetitive behavior is irrelevant; as we have previously discussed, *see supra* at 913–914, that possible consequence does not give standing to the UTU as it might shippers.

resist expansion of their own constitutional boundaries and reject any congressional orders or suggestions that would take them beyond the strictures of Article III. As such, in analyzing Article III standing problems, we cannot be *bound* by Congress' predictions or intentions as to the likely effect of legislation.[14]

That is not to suggest, of course, that courts should pay no attention to Congress' predictions of the effect of legislation. "[A]s a matter of comity, it is unseemly for a federal court to ignore such legislative opinion." *Dellums,* 863 F.2d at 978. But in assessing legislative judgments, courts should bear in mind that when Congress predicts that an injury is caused by a certain behavior or phenomenon and when it predicts the likely impact of legislation, it performs a task that is quite different from both the "fairly traceable" and "redressability" portions of the Article III standing inquiry. Congress need not meet constitutional, or any other, causation standards before exercising legislative power. *See Dellums,* 863 F.2d at 979. When Congress considers a bill that would restrict interlocking directorates between railroads, members or a committee may assert that interlocking directorates between railroads cause bankruptcies and facilitate collusion, but there is no constitutional requirement that such predictions of causation be correct, or even likely, for Congress to legislate in reliance on them. Even if there is only one chance in 1000 that a problem Congress is addressing can be traced to a particular cause, Congress, as an exercise of legislative judgment, may decide to pass a law that is based on that possibility. A court's causation inquiry is much more rigorous; before a court can constitutionally adjudicate a claim that relies on the allegation that future interlocking directorates

will injure UTU members, it must determine that the causal nexus is firm. Otherwise, it misuses judicial power. Similarly, Congress' analysis of the effectiveness of its product in remedying a perceived ill is necessarily less confined than a court's redressability inquiry. Unlike a court, Congress is not "constitutionally obliged to demonstrate that its exercise of legislative power will have a foreseeable proximate effect on any specific individual" or group of individuals. *See Dellums,* 863 F.2d at 979. Even if a proposed bill has but one chance in 1000 of solving or even mitigating a certain problem, Congress is free to enact it. As we noted in *Dellums,* "Congress may and does pass legislation that seeks only approximately or imprecisely ... to affect the behavior of men and nations." *Id.* Our concurring colleague—who criticizes our standing analysis without offering her own—therefore mixes apples and oranges when she suggests that we should apply the same "rational basis" standard that we use to measure congressional adherence to constitutional limits on *its* power when we judge "congressional determinations that bear on standing...." Concurring Opinion at 920. We are in no sense reviewing Congress' standing determination because Congress did not, by legislating, make one. As we have explained, Congress is not obliged constitutionally to ensure that its power is used only to decide "cases and controversies." Therefore, an explicit or implicit legislative prediction which induces congressional action is never and can never be "reviewed" by the judiciary when the latter decides a standing issue.

■ In light of those analytical differences, it is a difficult question whether we

---

**14.** Neither *Public Citizen v. F.T.C.,* 869 F.2d 1541 (D.C.Cir.1989) nor *National Wildlife Federation v. Hodel,* 839 F.2d 694 (D.C.Cir.1988) is to the contrary. In both of those cases, the court was apparently convinced by the congressional findings that it "credited." *See Public Citizen,* 869 F.2d at 1549 ("[Congress'] determination is consistent with our own understanding of the benefits of repeated warnings: only constant reminders of the health dangers associated with smokeless tobacco will effectively offset the persuasive power of the industry's advertisements promoting its use."); *Hodel,* 839 F.2d at 708–09 ("And while Congress cannot create standing on its own, it can provide legislative assessments which courts *can* credit in making standing determinations.... Congress' suggestion here ... is just such a legislative assessment.") (emphasis added and citations omitted). Thus, neither case stands for the proposition that courts *must* defer to congressional findings when assessing a party's Article III standing.

owe any deference to congressional predictions or assessments of cause and effect when we analyze a standing problem. Various members of this court have expressed different views on this subject. *See, e.g., Public Citizen v. FTC,* 869 F.2d 1541, 1549–50 & n. 16 (D.C.Cir.1989) (noting the "propriety" of judicial deference to congressional judgments of cause and effect relationships but stressing that deference "does not mean blind obedience"); *Dellums v. Nuclear Regulatory Comm'n,* 863 F.2d 968, 978–79 (D.C.Cir.1988) (observing that "we have never as a court held that we are bound to accept a congressional appraisal of the effect of its product. Indeed, to do so would be to permit Congress, by legislation, to amend the Constitution."); *id.* at 984 (Ruth B. Ginsburg, J., dissenting as to standing) ("[w]hen the redressability inquiry involves a question of predictive fact regarding matters outside the realm of judicial expertise, ... courts should be reluctant to contradict the judgment of Congress, doing so only upon a showing that Congress' judgment does not stand the test of rationality."). We need not finally settle this dispute to decide the case before us since, even under the formulation that is most deferential to Congress—that we should defer to a rational congressional assessment—we should not defer here. Although the original congressional assessment of the impact of interlocking directorates on railroads may well have been a rational *legislative* judgment when it was

made in 1914, it is too far out of date to serve as a basis for petitioner's standing.

The legislative history of the interlocking directorate provision, 49 U.S.C. § 11322(a) contains a few statements that arguably support the proposition that interlocking directorates may lead to railroad bankruptcies. First, a report submitted by the House Committee on Interstate and Foreign Commerce in May of 1914 stated that:

Whether the necessity for this provision is so great as represented or not, and whether the anticipated benefits are exaggerated or not, there is a *general impression* that most of the wreck and ruin of railroads and consequent damage to public service and the public interest has been due to the machinations of men who managed different corporations and by the policies adopted for the different corporations constituting a system or about to be consolidated into a system wrought ruin to some or all of the carriers involved.

H.R.REP. No. 681, 63d Cong., 2d Sess. 3 (1914), *reprinted in* 51 CONG.REC. 9598 (June 1, 1914) (emphasis added). In addition, there were three brief statements made during floor debates in the House in June of 1914 that asserted, in a conclusory fashion, that interlocking directorates were evil, the source of collusion, and an incentive for executives to sacrifice the interests of one carrier to those of another.[15]

---

15. Congressman Rayburn stated that:
the interlocking of directorates of great corporations of this country has been one of the greatest of the evil tendencies of the times.... It is as natural for a man who controls these corporations to work for the interest of the one in which he has the greatest pecuniary interest as it is for water to flow downhill.
51 CONG.REC. 9688 (June 2, 1914). Two days later, Congressman Aswell opined that:
It is greatly to be doubted if any single cause has contributed more to business corruption than the modern corporate business procedure of interlocking directorates. It is shown by a recent congressional report that ... one man ... was a director at one time in 67 great companies, at least one-half of them being railroad companies and one of them being the greatest industrial enterprise in the Nation, which sold its products to those same railroads, and at the same time he was fiscal agent for the railroad companies—thus he

was fiscal agent, buyer, and seller at one and the same time.
51 CONG.REC. 9814 (June 4, 1914). Finally, Congressman Barkley commented that:
One of the great evils of this generation ... has been the fact that the same men have been and are officers and directors in many corporations which ought to be competing companies, but which ... are bound together by unnatural and unholy ties. We seek to change that condition in this bill with reference to railroads ...
51 CONG.REC. 9828 (June 4, 1914).
These statements were actually made in 1914, when the provision at issue here, § 11322(a), first passed the House, but that provision did not pass the Senate in 1914 and indeed was not enacted until Congress passed the Transportation Act in 1920. The legislative history of the Transportation Act of 1920, consisting of weeks of debate in both houses, filling hundreds of

Assuming therefore that Congress' 1914 assessment as to the possible causal connections between interlocking directorates and railroad failures was rational as a legislative appraisal, and further assuming that a legislative appraisal of possible causation is entitled to deference when analyzing the causal element of standing, it would not be rational for us as a court to rely upon Congress' assessment in this case. To do so would ignore the fact that this assessment was made 75 years ago about a transportation industry in which railroads held a far more dominant market share than they do today. Moreover, we simply cannot disregard a record showing that interlocking directorates among railroads were formed virtually at will over the past 40 years, despite § 11322(a), with absolutely no evidence of any railroad failure resulting therefrom. In these circumstances—leaving aside the question of whether or when we are ever obliged to defer to congressional assertions of cause and effect relationships—it would be irrational to defer to Congress' 1914 pronouncements about the dangers of interlocking directorates among railroads in order to credit the allegation made by the petitioner here.

### III.

■ One final issue merits discussion. In comments submitted to the ICC opposing the proposed rule, petitioner stated that, "[t]he Commission's present procedure [requiring prior approval] is quite simple. Moreover, there is developed a public record as to the relationships, which better enables public protection." And petitioner states in its brief to this court that: "The non-filing of a notice that the interlocking directorate exemption is being invoked requires UTU to seek review of the class exemption to prevent injury prior to a specific exercise of the exemption, since changed directors affect rail operations." While we are somewhat puzzled as to what this means, even read generously to allege a procedural injury—that it will be more

difficult for the union to challenge interlocking directorates in the future because it will not have prior notice of them—we do not think that it confers standing on the petitioner since it bears no plausible nexus to a "substantive" injury.

It is beyond dispute that the federal courts may entertain suits alleging procedural injuries. *See, e.g., McGarry v. Secretary of the Treasury,* 853 F.2d 981, 984–85 (D.C.Cir.1988) (finding standing for a union challenging the failure of IRS to follow statutory procedure guaranteeing the union's right to comment on a waiver of minimum payments to a benefit plan); *National Wildlife Federation v. Hodel,* 839 F.2d 694, 712 (D.C.Cir.1988) (standing based on losing the statutory right to have an environmental impact statement prepared that could be used to evaluate and oppose future mining operations). But before we find standing in procedural injury cases, we must ensure that there is some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing. *See, e.g., McGarry,* 853 F.2d at 984–85 ("[I]n a claim such as that which appellants bring here, procedural and substantive stakes are inextricably intertwined. . . . In bringing this action for access to the application, appellants are not seeking to vindicate a procedural right *in vacuo.*"). (citation omitted). Without such a nexus, the procedural injury doctrine could swallow Article III standing requirements. Consider, for example, what would happen if the ICC adopted a rule stating that any American could intervene in an ICC proceeding to challenge any interlocking directorate between two railroads, and then later repealed that rule. Would every American be entitled to sue alleging that he or she suffered a procedural injury when the right to intervene was revoked? Surely some showing that interlocking directorates would be likely to injure the complainant should be required. Indeed, if a procedural injury alone suffices to confer Article III standing, any American could sue any agency alleging that it is arbitrary and capricious not to have a pro-

pages in the Congressional Record, contains no substantive discussion of the interlocking di-

rectorate problem or the expected effect of § 11322(a).

cedure by which they can challenge agency action.

Given the utter speculativeness of the petitioner's allegation of substantive injury, any allegation of procedural injury fails as well. The procedural injury arguably alleged here is as tenuously connected to a potential substantive injury as the allegation we found overly speculative in *Dimond v. District of Columbia*, 792 F.2d 179 (D.C.Cir.1986). In *Dimond*, we held that a plaintiff challenging the constitutionality of the District of Columbia no-fault insurance law lacked standing to claim that the District of Columbia Council—by failing to read the bill twice in substantially the same form prior to enactment—violated the D.C. statute stating the procedural rules for passing a bill. Even though we had ruled that the plaintiff had alleged sufficient injury in fact—his inability to sue under the no-fault insurance bill—we found no plausible link between the alleged procedural irregularity and the plaintiff's alleged injury since there was no reason to believe that the bill would have been substantially different even if the Council had followed its established procedures. Similarly here, since we do not believe that there is any likelihood that interlocking directorates will harm railroad workers, we see no reason to allow petitioner to sue on a theory that the ICC's exemption has made it marginally more difficult for the union to challenge interlocking directorates in the future.

We therefore dismiss the petition for review.

RUTH BADER GINSBURG, Circuit Judge, concurring in denying the petition for review:

This is a case in which standing and merits merge. It is best resolved, I believe, by the simple point my colleagues make "[i]n the first place": the petitioner has shown no cause "to credit the proposition that an interlocking directorate involving a class II or class III railroad will damage, let alone lead to the 'financial ruin' of, a carrier." Ct.Op. at 914. A case so slim seems to me an inappropriate one in which to rehearse at length, albeit again without resolving for this circuit, the large "question whether we owe any deference to congressional predictions or assessments of cause and effect when we analyze a standing problem." *Id.* at 917. I write separately, therefore, to disassociate myself from the court's extended essay.

I.

As the court's opinion tellingly demonstrates, standing in this case indeed depends totally on the merits of the claim that the challenged exemption will open the way for "the financial wrecking of rail carriers," and thereby hurt railroad workers. *Id.* at 913. *But cf. Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975) (standing "in no way depends on the merits"). That claim, as the Interstate Commerce Commission cogently explained, is insubstantial. The Commission was mindful of the small market share held by class II and class III railroads. *See* Ct.Op. at 910 n. 5. It relied on forty years' experience to conclude that an exemption not expanded to cover interlocks between class I railroads would advance the welfare of the railroad industry consonant with the deregulatory thrust of the Staggers Act. In short, the Commission sensibly exercised the discretion Congress entrusted to it.

A reviewing court, after finding the Commission's decision entirely reasonable, might say, as my colleagues do, that the injury petitioner asserts is imaginary, so petitioner has no standing. There is respectable authority, however, for pretermitting the difficult justiciability issue when, as in this case, the questions of standing and merits blend, and the merits are decidedly against the complainant. *See, e.g., Secretary of the Navy v. Avrech*, 418 U.S. 676, 677–78, 94 S.Ct. 3039, 3039–40, 41 L.Ed.2d 1033 (1974); *Chandler v. Judicial Council*, 398 U.S. 74, 89, 90 S.Ct. 1648, 1656, 26 L.Ed.2d 100 (1970); *United States v. Augenblick*, 393 U.S. 348, 351–52, 89 S.Ct. 528, 531, 21 L.Ed.2d 537 (1969); *Lorion v. Nuclear Regulatory Comm'n*, 785 F.2d 1038, 1041 (D.C.Cir.1986); *Na-*

*tional Wildlife Fed'n v. United States,* 626 F.2d 917, 924–26 & n. 16 (D.C.Cir.1980) (McGowan, J.); *Adams v. Vance,* 570 F.2d 950, 954 n. 7 (D.C.Cir.1977) (per curiam); *Chinese Am. Civic Council v. Attorney General,* 566 F.2d 321, 325 & n. 9 (D.C.Cir. 1977) (MacKinnon, J.); *Marker v. Schultz,* 485 F.2d 1003, 1004 (D.C.Cir.1973) (Leventhal, J.). I would follow that path here, in the interest of economy, restraint, and the avoidance of unnecessary constitutional confrontations. *Compare Pipon Society, Inc. v. National Republican Party,* 525 F.2d 567, 578 (D.C.Cir.1975) (en banc) (McGowan, J.), *cert. denied,* 424 U.S. 933, 96 S.Ct. 1147, 1148, 47 L.Ed.2d 341 (1976) ("In declining to decide the question of justiciability, we note its close relationship to the question we do decide, that is to say, the merits of the constitutional claim.... We agree that ... we cannot say [that defendants' conduct] offends the Constitution. What we decline to do, however, is to take the more drastic step of holding that we would never be competent to reach a contrary conclusion.") (footnote omitted), *with id.* at 596 (court should not have avoided justiciability issue) (Tamm and Robb, JJ., concurring in the result); *id.* at 605 (same) (Wilkey and Danaher, JJ., concurring in the result). When standing and merits are resolved by the same inquiry, why not so recognize candidly? In such instances, does the label really matter?

## II.

The court suggests, although it ultimately does not hold, that we should treat congressional determinations that bear on standing differently from other legislative policy judgments. I resist the suggestion, and would apply to standing analysis, as to merits matters, the general axiom the legislative judgments on social and economic issues enjoy a strong presumption of constitutionality. When no "fundamental right" or class attracting heightened scrutiny is affected, Supreme Court jurisprudence for a half century or more has cau-tioned judges to defer to economic and social prescriptions, proscriptions, and predictions by elected representatives, so long as one can posit a rational basis for the legislative determination. *See, e.g., Ferguson v. Skrupa,* 372 U.S. 726, 83 S.Ct. 1028, 10 L.Ed.2d 93 (1963); *Williamson v. Lee Optical,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *United States v. Carolene Prod. Co.,* 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234 (1938).

My colleagues imply that we should subject legislative judgments relevant to standing to a far more stringent brand of judicial review. They observe that "Congress surely cannot expand the constitutional jurisdiction of the federal courts—in essence, amend the Constitution—merely by legislating." *See* Ct.Op. at 915–16. But deference to rational congressional predictions no more charters Congress to amend article III than deference to the legislators' rational policy judgments allows Congress to amend substantive constitutional constraints on its authority. The courts can and do exercise a check. The issue is whether courts start their inquiry with an initial bias in favor of the disposition of a co-equal branch, or whether they owe "[no] deference to congressional predictions," Ct.Op. at 917, and therefore must be "convinced" that the legislature's judgment is not only reasonable, but right. *See* Ct.Op. at 916 n. 14.

By so brigading article III, effectively exalting it over other constitutional constraints on legislative action, the court is led to posit a broad category of measures that the Constitution permits Congress to place in the charge of administrators, but prohibits judges from monitoring; the court describes these measures as ones that only "approximately or imprecisely ... affect the behavior of men." *Id.* at 916 (internal quotation omitted). In this domain, it is apparently the court's vision that executive officers and commissions reign supreme, unchecked by the safeguard of judicial review.[*]

---

[*] So positioning executive officers is in tension with the precept that ordinarily no man (or body of men) should ultimately judge his own cause. *Cf.* The Federalist No. 10, at 58 (J. Madison) (Ford ed. 1898); *see also In re Sealed Case,* 838 F.2d 476, 527 & n. 26 (D.C.Cir.) (Ruth B.

I agree that courts are not *"bound* by Congress' predictions or intentions as to the likely effect of legislation." Ct.Op. at 916. Congressional economic and social judgments bearing on standing merit not rubber stamps, but respect, to the extent those judgments stand the test of rationality we apply to substantive legislative enactments. *See Dellums v. Nuclear Regulatory Comm'n,* 863 F.2d 968, 984 (D.C. Cir.1988) (Ruth B. Ginsburg, J., dissenting as to standing). Circuit precedent is largely in accord. *See Public Citizen v. F.T.C.,* 869 F.2d 1541, 1549 & n. 16 (D.C.Cir.1989); *Center for Auto Safety v. Thomas,* 847 F.2d 843, 855–56 & n. 15 (D.C.Cir.1988) (Wald, C.J.); *National Wildlife Fed'n v. Hodel,* 839 F.2d 694, 708 (D.C.Cir.1988); *Center for Auto Safety v. NHTSA,* 793 F.2d 1322, 1334–35 (D.C.Cir.1986); *Autolog Corp. v. Regan,* 731 F.2d 25, 31 (D.C.Cir. 1984); *International Ladies' Garment Workers' Union v. Donovan [ILGWU],* 722 F.2d 795, 811–12 (D.C.Cir.1983), *cert. denied sub nom. Breen v. ILGWU,* 469 U.S. 820, 105 S.Ct. 93, 83 L.Ed.2d 39 (1984); *Animal Welfare Institute v. Kreps,* 561 F.2d 1002, 1010 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1978).

### Conclusion

This easy case did not require us to air "a difficult question." *See* Ct.Op. at 916. Underscoring that the court eventually reserves decision of the weighty issue to another day and more appropriate case, and satisfied that the Commission acted rationally, not arbitrarily, I concur in denying the petition for review.

Ginsburg, J., dissenting), *rev'd sub nom. Morrison v. Olson,* 487 U.S. 654, 108 S.Ct. 2597, 101