James E. AKINS, et al., Appellants

v.

**FEDERAL ELECTION COMMISSION,**
Appellee

No. 94–5088.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 8, 1996.

Decided Dec. 6, 1996.

As Amended Jan. 3, 1997.

Daniel M. Schember, Washington, DC, argued the cause for appellants, with whom Abdeen Jabara was on the brief.

Richard B. Bader, Associate General Counsel, Federal Election Commission, Washington, DC, argued the cause for appellee, with whom Lawrence P. Noble, General Counsel, and David B. Kolker, Attorney, were on the brief. Vivien Clair, Attorney, Washington, DC, entered an appearance.

Before: EDWARDS, Chief Judge, WALD, SILBERMAN, WILLIAMS, GINSBURG, SENTELLE, HENDERSON, RANDOLPH, ROGERS, and TATEL, Circuit Judges, and BUCKLEY,* Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting opinion filed by Circuit Judge SENTELLE.

SILBERMAN, Circuit Judge:

Appellants challenge the district court's grant of summary judgment. The court affirmed the Federal Election Commission's dismissal of appellants' administrative complaint, which had alleged that the American Israel Public Affairs Committee (AIPAC) was a "political committee" subject to relevant reporting and disclosure requirements and contribution and expenditure limits of the Federal Election Campaign Act (FECA), 2 U.S.C. §§ 431–55 (1994 & Supp.1996). The court thought reasonable the Commission's definition of "political committee" as including only organizations that, in addition to meeting the statutory $1,000 expenditure threshold, have as their major purpose campaign related activity. We reverse.

## I.

James E. Akins, Richard Curtiss, Paul Findley, Robert J. Hanks, Andrew Killgore, and Orin Parker (collectively appellants) are former ambassadors, congressmen, or government officials. They are registered vot-

* At the time of *en banc* argument, Judge Buckley was a circuit judge in active service. He assumed senior status on September 1, 1996.

ers and "politically active persons who ... oppose AIPAC views on U.S. foreign policy in the Middle East" and who "compete with AIPAC in seeking to influence the views and actions of members of Congress, executive policymakers, and the public." Paul Findley is a former congressman from Illinois "widely perceived to be friendly to the Arab cause"; AIPAC is alleged to have helped to defeat him in the 1982 congressional election. AIPAC is an incorporated, tax-exempt organization with approximately 50,000 supporters nationwide and a budget of about $10 million (as of 1989) that lobbies Congress and the executive branch for military and economic aid to Israel and generally encourages close relations with Israel.

Appellants filed a complaint with the FEC in 1989, alleging *inter alia* that AIPAC had made campaign contributions and expenditures in excess of $1,000 and was therefore a political committee. A political committee is defined as "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes *expenditures* aggregating in excess of $1,000 during a calendar year." 2 U.S.C. § 431(4)(A) (emphasis added). "Expenditure" is defined in turn as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election." 2 U.S.C. § 431(9)(A)(i). Expenditures have been classified by caselaw and FEC interpretation to include three categories: independent expenditures not connected to any candidate, coordinated expenditures made in cooperation or consultation with a candidate, and direct contributions to a candidate. Once designated a political committee, an organization must file periodic reports disclosing all receipts and disbursements and identifying each individual to whom it gives or from whom it receives more than $200. *See* 2 U.S.C. § 434(b)(2)-(5). And it is prohibited from contributing more than $1,000 to any candidate. *See* 2 U.S.C. § 441a(a). Appellants claimed that AIPAC

met the statutory definition of political committee because, for example, it used full-time staff to meet with nearly every candidate for federal office, systematically disseminated campaign literature including candidates' position papers, and conducted regular meetings and phone calls with AIPAC supporters encouraging them to provide aid to particular candidates. Since these activities cost more than $1,000, AIPAC's failure to register as a political committee and comply with the requirements was a violation of the Act. *See* 2 U.S.C. §§ 433; 434(a)(1), (b); 441a(1), (2).

The General Counsel investigated the allegations and issued a report in 1992, making recommendations that were subsequently adopted by the Commission. The Commission determined that AIPAC likely had made campaign contributions exceeding the $1,000 threshold, but concluded that there was not probable cause to believe AIPAC was a political committee because its campaign-related activities were only a small portion of its overall activities and not its major purpose. The campaign activities were only conducted in support of its lobbying activities. No precedent was cited or rationale given, in the General Counsel's brief, his report, or the Commission's order, to support this interpretation of the statutory definition of "political committee." The Commission did find probable cause to believe that AIPAC violated § 441b, which generally prohibits campaign expenditures and contributions by corporations, but voted to take no action because it thought it was a close question whether AIPAC's expenditures were made in the course of communicating with its members, an exception to § 441b's prohibition. It therefore dismissed the complaint and closed the case.

Appellants sued in the district court pursuant to § 437g(a)(8), an unusual statutory provision which permits a complainant to bring to federal court an agency's refusal to institute enforcement proceedings, *cf. Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655-56, 84 L.Ed.2d 714 (1985), challenging the Commission's interpretation of the term "political committee."[1] The Com-

1. Appellants also contest some of the Commission's factual conclusions. In particular, they question the Commission's determination that

there was a lack of credible evidence concerning AIPAC's involvement in providing assistance to

mission responded that the Supreme Court, concerned with the Act's burdens on political speech, had narrowed the term's statutory definition in *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and *FEC v. Massachusetts Citizens for Life*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (*MCFL*). The Commission read these opinions—at least it so asserted in district court—as holding that an organization is a political committee only if its major purpose is the influencing of federal elections. Therefore, notwithstanding the plain language, the Commission claimed it interpreted the statute at least reasonably.

The district court agreed. Combining the Supreme Court's opinions (and our decision in *FEC v. Machinists Non–Partisan Political League*, 655 F.2d 380 (D.C.Cir.), *cert. denied*, 454 U.S. 897, 102 S.Ct. 397, 70 L.Ed.2d 213 (1981)), with *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) deference, the court concluded that the Commission's construction was "reasonable." A divided panel of this court affirmed. The FEC had not originally challenged appellants' standing, but the panel *sua sponte* asked the parties to brief the issue. The panel majority concluded that appellants had suffered an "informational injury" as voters and members of the public; the lack of information on AIPAC's contributions and expenditures, caused by the FEC's action, limited the information available to them as voters and impaired their ability to influence and inform the public and policymakers. The dissent thought appellants' injury was based instead on their competitive lobbying position *vis-a-vis* AIPAC. We determined to rehear the case *en banc* and directed the parties to focus on standing as well as the merits.

## II.

The Commission, as it did before the panel (after it was asked to address standing), challenges the court's jurisdiction. The Commis-

sion contends that neither the theories adopted by the panel judges nor appellants' somewhat different contentions satisfy Article III standing requirements. Appellants—whether as voters or political competitors (except for Findley whose standing as a candidate the Commission does not challenge [2])—not only lack injury-in-fact, their alleged injury was not caused by the Commission's actions and it is not redressable by this court's order. It is further argued that even if appellants make out Article III standing, they are not parties "aggrieved" under the statute and so lack prudential standing.

We take up first appellants' standing as voters. We have recognized in our "informational standing" cases that a party may be entitled to sue in federal court to force the government to provide information to the public (and thereby to it) if the government's failure to provide or cause others to provide that particular information specially affects that party. But this type of injury is narrowly defined; the failure must impinge on the plaintiff's daily operations or make normal operations infeasible in order to create injury-in-fact. *Compare Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1086 n. 29 (D.C.Cir. 1973) (the Atomic Energy Commission's decision not to provide an Environmental Impact Statement (EIS) on a reactor program established Article III injury because the Institute's main function was to distribute such information to the public), *and Action Alliance of Senior Citizens v. Heckler*, 789 F.2d 931, 937–38 (D.C.Cir.1986) (Article III injury where new government regulations restricting the availability of information on services for the elderly impaired AASC's ability to provide information, counseling, and referral services for its senior citizen members), *vacated on other grounds*, 494 U.S. 1001, 110 S.Ct. 1329, 108 L.Ed.2d 469 (1990), *with Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 122–23 (D.C.Cir.1990) (no informational injury where organization failed to show how the

---

the opponent of Paul Findley—a complainant here—in a 1982 congressional election.

**2.** The Commission does not explain why, if Findley does have standing, the rest of its standing

objections are nonetheless determinative, because we would still be obliged to reach the merits.

NHTSA's decision not to issue an EIS significantly diminished its ability to educate and inform the public about highway safety). Appellants' alleged injury as voters does not seem to fit within the limited contours of our informational standing cases. They do assert that their injury is based on the FEC's failure to provide appellants, as voters, with certain *information*, but their injury does not depend on the character of their organizational activity but rather on the proposition that the deprivation of that information impedes their ability to engage in a particular act guaranteed them in a democracy. They have been deprived of certain specific information that Congress thought voters needed to make an informed choice and therefore required "political committees," *inter alia*, to disclose.

■■■ Although Congress may not "create" an Article III injury that the federal judiciary would not recognize, anymore than Congress could amend the Constitution, *see United Transp. Union v. ICC*, 891 F.2d 908, 915–16 (D.C.Cir.1989), *cert. denied*, 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990); *Safir v. Dole*, 718 F.2d 475, 479 (D.C.Cir. 1983), *cert. denied*, 467 U.S. 1206, 104 S.Ct. 2389, 81 L.Ed.2d 347 (1984), Congress can create a legal right (and, typically, a cause of action to protect that right) the interference with which will create an Article III injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578, 112 S.Ct. 2130, 2145–46, 119 L.Ed.2d 351 (1992) (quoting *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975)); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 1121, 71 L.Ed.2d 214 (1982). Such a legal right can be given to all persons in the country. In that event, any person whose individual right has been frustrated or interfered with has standing to sue, even though all other persons have the same right, without the claim being regarded as a generalized grievance. That is why anyone denied information under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.* (1994), has standing to sue regardless of his or her reasons for suing. *Public Citizen v. FTC*, 869 F.2d 1541, 1548 & n. 13 (D.C.Cir.1989).[3]

■■■ Appellants would analogize this case to a FOIA case; any and all voters, in their view, suffer injury-in-fact when the FEC fails to force a political committee to report its activities to the Commission, which then has an obligation under the statute to make such information available to the public. *See* 2 U.S.C. § 438(a)(4) (requiring Commission to make all information filed promptly available to the public). But Congress did not quite create a legal right in all individual voters to obtain that information either directly or indirectly. The mere denial of an attempt to gain information does not create a cognizable injury under the Act. An individual must file a complaint with the Commission, which is provided authority to enforce the requirement that political committees report their activities. Only parties aggrieved by the dismissal of a complaint are entitled to challenge in court the Commission's refusal to enforce. (Although under § 437g(a)(8)(C), if a court decision directing the Commission to act is ignored by the FEC, the complainant can actually sue the offending party directly.) This indicates that the statutory entitlement to information is not as categorical or direct as that of FOIA.[4]

While a voter's rights under the Act are not exactly analogous to FOIA, appellants do have a point, and it is a point that distinguishes this case somewhat from our infor-

---

3. The dissent's *logic* suggests that even such a claim is only a generalized grievance; otherwise, to use the dissent's phraseology, the dissent "ducks the consequences" of admitting that all Americans could sue. Dissent at 2.

4. By contrast to FOIA, the National Environmental Policy Act, 42 U.S.C. § 4332(2)(C) (1994), does not provide a private right of action to enforce the EIS procedural requirements. To show standing, the litigant therefore must allege that he will be harmed by the underlying agency action contemplated, and that if forced to prepare (and consider) an EIS, the agency might act differently. *See Douglas County v. Babbitt*, 48 F.3d 1495, 1501 n. 6 (9th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 698, 133 L.Ed.2d 655 (1996); *Foundation on Economic Trends v. Lyng*, 943 F.2d 79, 83 (D.C.Cir.1991). Thus, the lack of the information itself is *not* an injury. Here, the injury is closer to the FOIA model; the injury to the voter is the *lack of the information itself*, and the only underlying agency action is the failure to require disclosure.

mational standing cases. *Cf. Public Citizen v. Department of Justice,* 491 U.S. 440, 449–50, 109 S.Ct. 2558, 2564–65, 105 L.Ed.2d 377 (1989) (analogizing requests for access to information under the Federal Advisory Committee Act (FACA) to requests under FOIA). Congress clearly intended voters to have access to the information political committees were obliged to report. The whole theory of the statute is that voters are benefitted insofar as they can determine who is contributing what to whom. *See Buckley,* 424 U.S. at 66–67, 96 S.Ct. at 657 (disclosure "provides the electorate with information 'as to where political campaign money comes from and how it is spent by the candidate' in order to aid the voters in evaluating those who seek federal office," deters actual corruption and the appearance of corruption, and helps the public detect post-election *quid pro quos*). Although Congress cannot determine when someone has suffered Article III injury, we do not think it can be denied that this sort of information that Congress required disclosed aids voters, if and when they vote. If a party is denied information that will help it in making a transaction—and a vote can be thought of as a kind of transaction—that party is obviously injured in fact. We recognized as much in *Public Citizen,* 869 F.2d at 1546 & n. 7, where we determined that a group representing consumers had standing to challenge the FTC's regulations exempting from health warnings certain promotional items sold by manufacturers of smokeless tobacco. Those promotional items, a form of advertising, were designed to encourage the purchase of smokeless tobacco, and some of the plaintiffs' members and their families alleged that they used or may use those products without the statutorily required reminder of the dangers that consumption entails. We reasoned that such information would be of substantial value to the plaintiffs' members, and therefore they were injured because they were deprived of it at the time they purchased or used the product. *Id.*

Although admittedly registered voters—even the more limited subset of those who actually vote—is a very large group of Amer-

icans, we do not think it analytically sound to describe a lawsuit brought by *affected* registered voters as presenting only a generalized grievance. The term "generalized grievance" does not just refer to the number of persons who are allegedly injured; it refers to the diffuse and abstract nature of the injury. *See, e.g., Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (citizen and taxpayer challenge to membership of members of Congress in Armed Forces Reserves during Vietnam War presents generalized grievance); *see also Lujan v. Defenders of Wildlife,* 504 U.S. at 573–74, 112 S.Ct. at 2143–44. The number of potential plaintiffs matters not so long as each can assert a distinct, individual injury. *See Sierra Club v. Morton,* 405 U.S. 727, 734, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972); *Michel v. Anderson,* 14 F.3d 623, 626 (D.C.Cir.1994). A voter deprived of useful information at the time he or she votes suffers a particularized injury in some respects unique to him or herself just as a government contractor, allegedly wrongfully deprived of information to be made available at the time bids are due, would suffer a particularized injury even if all other bidders also suffered an injury. As we understand our dissenting colleagues, they agree with the Commission that appellants are presenting a generalized grievance because it is *information* that they seek. Apparently if Congress provided that public or private employers were obliged to provide their employees free transportation to the polls, enforceable through an agency like the FEC, that would be a particularized right (except that according to Section B of their opinion it would not be redressable). We think the dissent is just incorrect in refusing to see information as a commodity of value.[5]

To be sure, it would not be enough for standing in this case for appellants to assert only that they were voters, for appellants would not be injured as voters if AIPAC's activities were unrelated to any election in which they voted. But appellants can hardly be expected to allege that AIPAC made contributions in the elections in which they vot-

---

**5.** Since the dissent concedes that *all* appellants would have standing if the information had been supplied to the FEC and then simply withheld,

Dissent at 746–47, 745 n.2, it would appear that the dissent's only *real* objection to standing is redressability.

ed, for whether AIPAC made such contributions is precisely the information of which appellants claim they have been deprived. As the FEC found that AIPAC likely did contribute in excess of $1,000 in one year, and the FEC did not identify the elections to which these contributions were made, there is nothing to indicate that appellants did not vote in various federal elections in which AIPAC allegedly made contributions that qualified it as a political committee. Therefore we conclude that appellants have standing as *affected* voters. We thus need not resolve whether appellants also have standing as political competitors of AIPAC, or whether Mr. Findley—who was last a candidate in 1982, *see Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969) (no controversy where it was unlikely that congressman would again be a candidate for Congress)—has standing as a candidate.

The Commission also questions the causal connection between its decision and appellants' injury, as well as causation's corollary in standing analysis—redressability. As best we understand the FEC's rather confusing argument,[6] its causation objection is primarily directed to appellants' alleged lobbying injury rather than their injury as voters. That the Commission does not make the argument *vis-a-vis* appellants' standing as voters is understandable because such a theory would stretch causation to its breaking point; no one would have standing to challenge the Commission's determination, or for that matter, many other administrative agency actions. It is only necessary for a voter to allege that *his* vote and others' votes may have been affected by the disclosure of information that a contrary FEC determination would have made available.

The Commission's argument that appellants lack standing because we cannot issue an order that redresses their injury—with which the dissent agrees—strikes us as a breathtaking attack on the legitimacy of virtually all judicial review of agency action. The Commission points out that it has enforcement discretion, so that even if we were

to determine that its statutory interpretation of "political committee" is erroneous, it does not follow that AIPAC would be required to disclose the information a political committee must: the FEC might settle with AIPAC on terms that did not require disclosure. Yet all regulatory agencies enjoy some measure of enforcement discretion. If that factor were to mean that an agency's *legal* determination was not reviewable, that would virtually end judicial review of agency action. We rarely know when we entertain a case, say, challenging an agency's interpretation of a statute, whether the agency's *ultimate* action will be favorable to the petitioner or appellant. *See Public Citizen,* 491 U.S. at 450, 109 S.Ct. at 2564–65 (that FACA documents may not be disclosed pursuant to statutory exceptions no bar to redressability); *Competitive Enter. Instit.,* 901 F.2d at 118 ("[a] remand that would leave the agency free to exercise its discretion in a proper manner, then, *could* lead to agency action that would redress petitioners' injury") (emphasis added); *Foundation on Economic Trends v. Lyng,* 943 F.2d at 83 & n. 2 (plaintiff typically not required to show that the agency was likely to take a particular substantive action in response to EIS). Our job is limited to correcting a legal error—if error is committed—in the agency decision. *See SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947). The error must, of course, be one upon which the agency decision rests, an analytical precondition to the agency action. If that is so, it has *always* been an acceptable feature of judicial review of agency action that a petitioner's "injury" is redressed by the reviewing court notwithstanding that the agency might well subsequently legitimately decide to reach the same result through different reasoning. *See id.*

Nor can it be relevant, as the dissent supposes, that AIPAC might not comply with the Commission's order. That too is always true when an agency's nonaction against a third party is challenged. In any event, under this very unusual statute appellants are not dependent on the Commission's compli-

6. Appellants did not, it should be noted, provide much help on the difficult standing issue in this case.

ance with our decision correcting the Commission's interpretation of the phrase "political committee." As we noted earlier, if the Commission fails to "conform" to our "declaration," the appellants, as the original complainant, may bring their own civil action to remedy the violation of law. 2 U.S.C. § 437g(a)(8)(C). It would appear under this provision that if the Commission gave only lip service to compliance with our order and settled with AIPAC without requiring disclosure, as the dissent suggests could occur, appellants would be able to seek disclosure directly. This unique statutory provision then completely undermines the Commission's and the dissent's redressability argument—even on the argument's own terms.[7]

 Finally, the Commission challenges appellants' prudential standing, claiming they are not parties aggrieved within the meaning of the statute, which provides that "any party aggrieved by an order of the Commission dismissing a complaint filed by such party ... may file a petition with the United States District Court for the District of Columbia." 2 U.S.C. § 437g(a)(8)(A). The Supreme Court, interpreting similar language in the Administrative Procedure Act permitting judicial review generally if a party is "aggrieved," has held that term obliges federal courts to determine whether, under the substantive statute, the party seeking judicial review is within the zone of interests. Thus

> [i]n cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are *so marginally related* to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intend-

ed to permit the suit. The test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987) (citations omitted) (emphasis added). Here, although the governing judicial review provision is included within the substantive statute, the same test logically should apply to determine whether a party challenging a Commission decision qualifies. But why would appellants not meet that test? The Commission's argument again is rather convoluted. It concedes, as it surely must, that the statute is designed primarily to aid voters, *Buckley,* 424 U.S. at 66–67, 96 S.Ct. at 657–58; therefore, it seems strange to even suggest that a voter would not have prudential standing. Yet the Commission asserts that "a pure voter's interest [is] too generalized to satisfy Article III *or the zone of interests test*" (emphasis added). We have already explained why we do not regard appellants' case as presenting a "generalized grievance." *See supra* pp. 737–38. And although the numbers of persons who might be eligible to sue might well bear on a determination as to whether Congress intended such a broad class of potential litigants, in this case it is apparent that Congress treated the broad class—voters—as the core beneficiaries of the statute. Therefore, we simply cannot glean any congressional intent to preclude members of that class from suing—so long as they filed a complaint with the FEC that was dismissed.[8]

---

7. In an argument that seems to be based more on mootness than redressability, the Commission also contends that appellants' injury would not be redressed by a favorable decision of this court because AIPAC is barred from making *future* contributions to candidates by another section of the statute, § 441b, which prohibits corporate contributions. This is a *non sequitur;* appellants claim they are injured because AIPAC was permitted to avoid registering as a political committee and disclosing its *past* receipts and expenditures. That disclosure of past activities would presumably affect voters in the future. If such injury were not redressable, once an election ended virtually all electoral conduct would be

beyond review. In this case, for example, it took well over two years for the Commission to make a probable cause determination.

8. It is not clear from the Commission's argument who would have prudential standing. Although the fact that no one would have standing to sue is not a reason to find Article III standing, *Schlesinger v. Reservists,* 418 U.S. at 227, 94 S.Ct. at 2935, the same cannot be said for prudential standing. Where Congress has created a right to seek judicial review, *see* 2 U.S.C. § 437g(a)(8), it cannot be the case that Congress intended that right to extend to no one.

The Commission contends that "aggrieved" must be read to require a more direct connection to or a greater stake in the conduct in question, call it "voter plus" status. But appellants are not merely voters; they are voters who have filed a complaint with the Commission that has been dismissed. In sum, appellants' interests as voters clearly are not "so marginally related to or inconsistent with the purposes implicit in the statute," *Clarke,* 479 U.S. at 399, 107 S.Ct. at 757, for it to be unreasonable to assume Congress intended to permit them to sue.

## III.

Section 431(4)(A) defines "political committee" solely in terms of "expenditures" and "contributions": a political committee is "any committee, club, association, or other group of persons which receives contributions aggregating in excess of $1,000 during a calendar year or which makes expenditures aggregating in excess of $1,000 during a calendar year." The FEC concedes that this language sets unambiguous requirements for classification as a political committee. But it asserts that Supreme Court decisions have narrowed the reach of the statutory language in response to First Amendment concerns. The FEC relies on language in *Buckley,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659, and *MCFL,* 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539, in claiming that an organization should only be classified as a political committee if, in addition to exceeding the $1,000 expenditure limit, the *organization's* major purpose is the nomination or election of a candidate or the organization is controlled by a political candidate.

At minimum, the Commission argues, these cases created an ambiguity in the statutory definition of "political committee" so that the Commission's subsequent interpretation of the term is owed deference—and passes muster—under *Chevron* Step II. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). When Congress is silent or ambiguous, the Commission reminds us, an agency's construction is owed deference if it is permissible. That the ambiguity here arose from Supreme Court inter-

pretation does not, it is argued, affect this general rule of deference; the agency still has discretion to fill the interpretive "gap." According to the FEC, the gap to be addressed here is not *whether* the Court established a major purpose test as a generic definition of political committee (which the Commission assumes), but *how* such a test is to be implemented. Since the Court did not decide the types of organizations that are within its "definition" of political committee, whether contributions and expenditures are treated the same, and so on, the Commission has discretion to flesh out the concept, consistent with Supreme Court precedent.

■ We think the FEC's plea for deference is doctrinally misconceived. It is undisputed that the statutory *language* is not in issue, but only the limitation—or really the extent of the limitation—put on this language by Supreme Court decisions. We are not obliged to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle. The Commission's assertion that Congress and the Court are equivalent in this respect is inconsistent with *Chevron's* basic premise. *Chevron* recognized that Congress delegates policymaking functions to agencies, so deference by the courts to agencies' statutory interpretations of ambiguous language is appropriate. But the Supreme Court does not, of course, have a similar relationship to agencies, and agencies have no special qualifications of legitimacy in interpreting Court opinions. There is therefore no reason for courts—the supposed experts in analyzing judicial decisions—to defer to agency interpretations of the Court's opinions. This is especially true where, as here, the Supreme Court precedent is based on constitutional concerns, which is an area of presumed judicial competence. *See Public Citizen v. Burke,* 843 F.2d 1473, 1478 (D.C.Cir.1988).

■ In sum, since it is not, and cannot be, contended that the statutory language itself is ambiguous, and the asserted "ambiguity" only arises because of the Supreme Court's narrowing opinions, we must decide *de novo* the precise impact of those opinions. In that regard, we think the Commission misstates the interpretation issue. As we

noted, it casts the question as how the major purpose test applies, as if the test were set forth categorically. But as we see the key question, it is whether the Supreme Court's major purpose limitation imposed in certain circumstances for constitutional reasons applies in another circumstance—this case—in which the same constitutional concerns may not be implicated.

Turning to the Supreme Court's decisions, the Court did state in *Buckley* that the term political committee "need only encompass *organizations* that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate." 424 U.S. at 79, 96 S.Ct. at 663 (emphasis added). And this notion was repeated in *MCFL*: "an entity subject to regulation as a 'political committee' under the Act is one that is either 'under the control of a candidate or the major purpose of which is the nomination or election of a candidate.'" 479 U.S. at 252 n. 6, 107 S.Ct. at 625 n. 6 (quoting *Buckley*, 424 U.S. at 79, 96 S.Ct. at 663). Although MCFL apparently was not charged with violating the political committee provisions, the Court in *dicta* said that "should MCFL's independent spending become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee." *Id.* at 262, 107 S.Ct. at 630.

While the above language in *Buckley* and *MCFL* can literally be read to support the FEC's position, both cases focused on the constitutional concerns raised by *independent expenditures*, which are not coordinated with or made in consultation with any candidate, as distinguished from coordinated expenditures or direct contributions. *See Colorado Republican Fed. Campaign Comm. v. FEC*, —— U.S. ——, ————, 116 S.Ct. 2309, 2315–16, 135 L.Ed.2d 795 (1996). Independent expenditures are the most protected form of political speech because they are closest to pure issue discussion and therefore farthest removed from the valid goal of preventing election corruption. *Buckley*, 424 U.S. at 19–23, 78–81, 96 S.Ct. at 634–37, 663–

64; *MCFL*, 479 U.S. at 259–60, 107 S.Ct. at 628–29. They raise more serious First Amendment concerns because it is difficult to determine when an expenditure is independent, and regulation therefore risks chilling protected speech. For that reason, in *Buckley* the Supreme Court determined that expenditure limits are more likely to violate the First Amendment because they place substantial and direct restrictions on the ability to engage in political speech. *See* 424 U.S. at 39–59, 96 S.Ct. at 644–54. Limitations on contributions or coordinated expenditures, on the other hand, were thought to raise fewer constitutional concerns because they serve the basic governmental interest of protecting the electoral process while only marginally restricting political debate and discussion. *See Colorado Republican Fed. Campaign Comm.*, —— U.S. at ——, 116 S.Ct. at 2315; *Buckley*, 424 U.S. at 28, 96 S.Ct. at 639 (such limits "focus[ ] precisely on the problem of large campaign contributions—the narrow aspect of political association where the actuality and potential for corruption have been identified"); *see also Buckley*, 424 U.S. at 28, 30, 36, 96 S.Ct. at 639, 640, 643.

■ To support its interpretation, the FEC points to *Buckley's* discussion of § 434(e), which imposes disclosure requirements on "[e]very person (other than a political committee or candidate)" making contributions or expenditures exceeding $100.[9] "Contributions"—when defined as direct or indirect contributions to a candidate, political party, or campaign committee, or expenditures placed with the cooperation or consent of a candidate—were determined to "have a sufficiently close relationship to the goals of the Act," and therefore limits on them are constitutional. *Id.* at 78, 96 S.Ct. at 663. The Court noted that the meaning of "expenditure," however, posed line-drawing difficulties because it posed the danger of "encompassing both issue discussion and advocacy of a political result." *Id.* at 79, 96 S.Ct. at 663. Therefore, the reach of § 434(e) was limited by "constru[ing] 'expenditure' for purposes of

---

9. Section 434(e) has subsequently been amended: "Every person (other than a political committee) who makes independent expenditures in an aggregate amount or value in excess of $250

during a calendar year" shall be subject to certain reporting and disclosure requirements. 2 U.S.C. § 434(c)(1).

that section ... to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. at 663. In the midst of this analysis of the scope of "expenditures" under § 434(e), the Court noted in *dicta* that the meaning of political committee, because it was defined solely in terms of contributions and expenditures, posed the same line-drawing problem. The Court's language that apparently refers to the major purpose of an organization, given this context, does not really support the Commission's interpretation:

> To fulfill the purposes of [FECA, political committees] need only encompass organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a candidate. *Expenditures* of candidates and of "political committees" *so construed* can be assumed to fall within the core area sought to be addressed by Congress. They are, by definition, campaign related.

*Id.* at 79, 96 S.Ct. at 663 (emphases added). We think the better interpretation of this language, as appellants suggest, is that when an *organization* controlled by a candidate or the major purpose of which is election-related makes disbursements, those disbursements will presumptively be *expenditures* within the statutory definition. The Court clearly distinguished *independent expenditures* and *contributions* as to their constitutional significance, and its references to a "major purpose" test seem to implicate only the former.

As we noted, certain language in *MCFL* can also be read to support the FEC's position, but the Court was again addressing First Amendment problems with the regulation of *independent expenditures*. The Court *held* that § 441b, which prohibits corporate contributions or expenditures "in connection with any election," was unconstitutional as applied to MCFL because the Act's reporting and disclosure requirements might discourage protected political speech of such advocacy groups. *See* 479 U.S. at 253–56, 107 S.Ct. at 625–27. Still, the Court's analysis clearly distinguished contributions and expenditures: "should MCFL's *independent spending* become so extensive that the organization's major purpose may be regarded as campaign activity, the corporation would be classified as a political committee." *Id.* at 262, 107 S.Ct. at 630 (citing *Buckley*, 424 U.S. at 79, 96 S.Ct. at 663) (emphasis added). As in *Buckley*, this language can be read as merely creating a presumption that certain organizations' expenditures are "made ... for the purpose of influencing any election"; an organization devoted almost entirely to campaign spending could not plead that the administrative burdens associated with such spending were unconstitutional as applied to it. As in *Buckley*, the underlying concern is that congressional regulation, in its effort to achieve full disclosure, may impermissibly discourage protected independent expenditures. In short, the Court's rationale in *MCFL* and *Buckley* is simply inapplicable to the present case. There is no constitutional problem with applying § 431(4)(A) to AIPAC or to other organizations making campaign *contributions* (or coordinated expenditures) exceeding the statutory limits.[10]

The FEC further contends, however, that we endorsed its "major purpose" test in *Machinists Non–Partisan Political League*, 655 F.2d at 392. In *Machinists*, we held that "draft groups" that promoted the acceptance of particular individuals prior to their actual nomination did not fall within the definition of "political committee" because the expenditures and contributions were not made to a "candidate." *Id.* at 396. Our decision was based in large part on Congress' intent to exclude draft groups from the definition of political committee. *See id.* at 394–96 (Congress failed to respond to the FEC's repeated requests to amend the Act to apply

---

10. The Commission makes no claim that AIPAC actually qualifies for the *MCFL* constitutional exemption, which requires that the organization be engaged in issue advocacy, that it not accept contributions from labor unions or corporations, and that it have no shareholders or other persons with a claim on its assets who would have a disincentive to withdraw if they disagreed with its political positions. 479 U.S. at 264, 107 S.Ct. at 631. Indeed, the General Counsel's brief advised that AIPAC did not qualify because it apparently receives certain contributions from corporations.

contribution limits to draft groups). And our analysis, contrary to the FEC's suggestion, supports appellants' interpretation of the major purpose test. We did quote *Buckley's* language—noted above to be equivocal—on an organization's major purpose. *Id.* at 392. But we concluded that *Buckley* had endorsed the "narrowing construction" of "political committee" developed in *United States v. National Comm. for Impeachment,* 469 F.2d 1135 (2d Cir.1972) (*NCFI*), and *American Civil Liberties Union, Inc. v. Jennings,* 366 F.Supp. 1041 (D.D.C.1973) (*ACLU*) (three-judge court), *vacated as moot sub nom. Staats v. ACLU,* 422 U.S. 1030, 95 S.Ct. 2646, 45 L.Ed.2d 686 (1975), and we noted that "[a]ll three of these decisions recognized the grave constitutional difficulties inherent in construing the term 'political committee' to include groups *whose activities* are not under the control of a 'candidate,' or directly related to promoting or defeating a clearly identified 'candidate' for federal office." *Id.* at 393 (emphasis added). Our use of the word "activities"—while admittedly not free from ambiguity—indicates that, as appellants contend, it is the purpose of the organization's disbursements, not of the organization itself, that is relevant.[11]

The FEC's interpretation of "political committee" would, as appellants point out, allow a large organization to contribute substantial sums to campaign activity, as long as the contributions are a small portion of the organization's overall budget, without being subject to the limitations and requirements imposed on political committees. Thus, an organization spending its entire $1 million budget on campaign activity would be a political committee, while another organization spending $1 million of its $100 million budget on campaign activity would not. This would wholly eviscerate the $1,000 limit in § 431(4)(A)'s definition of "political committee." That such an organization, as the Commission emphasizes, may be limited by other statutory provisions as well—*e.g.,* § 441b's prohibition on corporate expenditures and § 434(c)'s restrictions on persons (defined in § 431(11) to include corporations) making independent election expenditures—is irrelevant. There is no indication that Congress intended to limit one section in light of others or to make their application mutually exclusive. As the Commission concedes, various statutory provisions impose different, if overlapping, limits and requirements on organizations; these differences represent the sound exercise of congressional judgment as to the various degrees of risk to the election process posed by certain activities.

The Commission seeks to minimize the implications of its interpretation by arguing that it has not yet resolved when an organization's spending becomes "a" major purpose that counts toward the "political committee" threshold.[12] But we think little

---

**11.** Appellants argue that the major purpose test is properly employed to determine whether an organization's independent disbursements constitute "expenditures" within the meaning of § 431(9)(A)(i), such that they count toward the $1,000 limit defining political committee status. *See NCFI,* 469 F.2d 1135; *ACLU,* 366 F.Supp. 1041. We do not for purposes of this appeal have to determine finally whether appellants' version of the test is the only possible one. But we reject the FEC's contention that appellants' interpretation of the major purpose test is redundant because the statute already requires that an expenditure be "made for the purpose of influencing an election." A "major purpose" test was developed at least partly in order to construe this definition narrowly so as to avoid constitutional concerns. *See NCFI,* 469 F.2d 1135; *ACLU,* 366 F.Supp. 1041; *cf. Buckley,* 424 U.S. at 76–78, 96 S.Ct. at 662–63. The FEC assumes that this statutory language already had a precise meaning—under the control of a candidate or made with the consent or authorization of a candi-

date—which in fact *NCFI,* 469 F.2d at 1141, and *Buckley,* 424 U.S. at 40–42, 79, 80, sought to impose. Appellants' major purpose test thus can be seen not as a tautology but as a necessary judicial gloss on the statutory definition of expenditure.

**12.** The Commission nevertheless claims that it has consistently implemented its interpretation of the statute post-*Buckley.* The FEC points to two of its recent decisions, post-dating this litigation, to show its adherence to the major purpose test. *See* AO 1995–11, 2 Fed. Elec. Camp. Fin. Guide (CCH) ¶ 6148–49 (1995); AO 1994–25, 2 Fed. Elec. Camp. Fin. Guide (CCH) ¶ 6125. But as appellants note, earlier FEC advisory opinions—in the nearly 20 years after *Buckley* and 10 after *MCFL*—did not articulate a major purpose test; they instead appear to examine whether particular expenditures exceeded the $1,000 limit, without regard to the percentage of spending that was campaign related or to the organization's

of this suggested safety valve; the inevitable logic of the Commission's test is that the two organizations described above, spending precisely the same amount to influence federal elections and therefore presenting precisely the same threat of election corruption, will be treated differently. And if the Commission is truly considering a variable major purpose standard as applied to contributions—now it applies and now it does not—such discretion in itself raises First Amendment concerns. *Cf. Forsyth County v. Nationalist Movement,* 505 U.S. 123, 130–33, 112 S.Ct. 2395, 2401–03, 120 L.Ed.2d 101 (1992) (First Amendment prohibits investing official in licensing scheme with discretion). Moreover, if it relied on such a standard, the Commission should have determined more precisely the level of AIPAC's campaign spending and should have explained why that funding was not "a" major purpose.[13]

There is no contention that AIPAC's disbursements were independent expenditures, so there is no constitutional barrier to application of § 431(4)(A)'s plain terms. The FEC found that AIPAC likely made campaign contributions in excess of $1,000. Its decision that no probable cause existed to believe AIPAC was a political committee, and its consequent dismissal of appellants' complaint, were therefore based on its mistaken interpretation of § 431(4)(A). This error requires that we reverse the dismissal of the complaint and remand to the FEC for further action not inconsistent with this opinion.

\* \* \* \*

The judgment of the district court is

*Reversed.*

major purpose. *See, e.g.,* AO 1979–41, 1 Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5426; AO 1988–22, 2 Fed. Elec. Camp. Fin. Guide (CCH) ¶ 5932. We by no means think the FEC's apparent change of position dispositive, but it does undermine the Commission's insistence that the Supreme Court clearly imposed this test, particularly given its failure to explain that view in its Order in this case.

13. The FEC's decisions on how and to what extent to investigate a complaint, while reviewable, command substantial deference. *See FEC v. Rose,* 806 F.2d 1081, 1091 (D.C.Cir.1986). How-

SENTELLE, Circuit Judge, dissenting, with whom Circuit Judge HENDERSON joins:

The standing doctrine "requires that anyone who would invoke the aid of the courts in resolving a complaint must allege, at a minimum, an actual or imminent injury personal to the plaintiff that is fairly traceable to the defendant's conduct and that is likely to be redressed by requested relief." *Louisiana Env. Action Network v. Browner,* 87 F.3d 1379, 1382 (D.C.Cir.1996). For the reasons that follow, I would hold that appellants have not established these minimum requirements.

*A. Informational Standing*

When this matter was before the panel, I wrote for the majority finding standing based on "informational injuries." I concluded at the time, and believe now, that the panel was compelled by circuit precedent to reach that result. *See, e.g., Save Our Cumberland Mountains, Inc. v. Hodel,* 826 F.2d 43, 54 (D.C.Cir.1987) (R.B. Ginsburg, J., concurring) (law of the circuit " 'whether or not [it] is correct' ... binds us unless and until overturned by the court en banc or by Higher Authority."). Because circuit precedent dictated that an organization can establish standing by alleging that a governmental action restricted the flow of information disseminated by the organization in its regular activities, *Action Alliance of Senior Citizens v. Heckler,* 789 F.2d 931, 939 (D.C.Cir.1986), I thought the panel had no choice on the issue. Because the en banc court is not so restricted but is empowered to depart from circuit precedent, if I were writing for the majority today, I would take this occasion to modify circuit law on informational standing and would not find informational standing on the present record.

ever, the investigation here likely would have been insufficient to support a finding that AIPAC's contributions were not "a" major purpose. The Commission asserts in its brief, without citation to the record, that "the evidence *indicated* that AIPAC's campaign spending never even reached one percent of its annual budget," but that already approaches $100,000 (emphasis added). In any event, given our resolution of the case, the factual findings already made by the FEC indicate that AIPAC should be classified as a political committee.

The majority, rightly, rejects informational standing for plaintiffs in this case. I applaud the majority's decision to treat the concept as a narrow one. I agree with the majority that a party cannot successfully claim informational standing where he cannot establish that "the government's failure to provide or cause others to provide" information "impinge[s] on the plaintiff's daily operations or make[s] normal operations infeasible...." Maj. Op. at 735 (citing *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1086 n. 29 (D.C.Cir.1973)). While the majority is not clear on why appellants' complaint differs from that of, for example, the organization for the elderly in *Action Alliance*, it at least seems to be attempting to narrow the concept of informational standing by holding that the "[a]ppellants' alleged injury as voters does not seem to fit within the limited contours of" informational standing precedent. Maj. Op. at 736. But the majority retains the fundamental error which has infected our informational standing jurisprudence when it affords standing to the plaintiffs/appellants as voters, on a rationale indistinguishable from informational standing. Indeed, it recites in informational terms that "[a] voter *deprived of useful information* at the time he or she votes suffers a particularized injury in some respects unique to him or herself just as a government contractor, allegedly wrongfully deprived of information to be made available at the time bids are due, would suffer a particularized injury even if all other bidders also suffered an injury." Maj. Op. at 737 (emphasis added). In setting forth this analysis, the majority admits that the class of "registered voters—even the more limited subset of those who actually vote—is a very large group of Americans...."[1] *Id.* at 737. But the majority ducks the consequences of this admission.

The Supreme Court expressly held in *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), that "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Id.* at 499, 95 S.Ct. at 2205 (citing, *e.g., Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)). The majority has not explained why the claimed lack of information for the entire class of voters (or potential voters) does not fall squarely within this precept. The attempted distinction that "'generalized grievance' does not just refer to the number of persons who are allegedly injured [but] refers to the diffuse and abstract nature of the injury," Maj. Op. at 737, gets nowhere without an explanation as to why this is not a diffuse and abstract injury.[2] The comparison to the bidder deprived of information accomplishes even less. Chief Justice Burger in *Schlesinger v. Reservists* made that comparison for us. "It is one thing for a court to hear an individual's complaint that certain specific government action will cause that person private competitive injury ... but it is another matter to allow a citizen to call on the courts to resolve abstract questions." *Schlesinger*, 418 U.S. at 223, 94 S.Ct. at 2933 (footnote omitted). Cases in this second category, Chief Justice Burger noted, raise "only a matter of speculation whether the claimed violation has caused concrete injury to the particular complainant." *Id.* This is the flaw of the new form of standing—voter standing—that the majority creates today. It, like the broad definition of informational standing, relies on a diffuse rather than a particularized injury.

I would not only reject informational standing as a basis for this claim, but, be-

---

1. It is not at all clear why the injury is limited to the class of registered voters as opposed to all potential voters as the information, if useful, could be as likely to warrant registration and voting as voting in a particular direction.

2. Contrary to the majority's assertion, Maj. Op. at 736 n.3, our logic does not suggest that a claim for information under FOIA is only a generalized grievance. FOIA gives everyone a right

to information. A FOIA injury, therefore, is not a "'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth*, 422 U.S. at 499, 95 S.Ct. at 2205. It is a particularized injury personal to the disappointed requester, and *Warth's* holding is therefore not implicated. Similarly, if the FEC had the information appellants want and refused to provide it, they might have a cognizable injury affording them standing.

cause I see no basis for distinction between this case and, for example, *Action Alliance,* I would reexamine the entire concept of informational standing as it now exists in this circuit, and I would reject it. I do not find within the majority opinion any justification for our precedent on that subject. The majority's creation violates the principle that a plaintiff generally may not rely for a claimed injury on a mere ideological interest, *Competitive Enter. Inst. v. NHTSA,* 901 F.2d 107, 112 (D.C.Cir.1990), by perpetuating the notion that an organization has standing where the alleged injury is that the government's failure to provide information to the organization "impinge[s] on the plaintiff's daily operations or make[s] normal operations infeasible." Maj. Op. at 735 (citing *Scientists' Inst. for Public Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079, 1086 n. 29 (D.C.Cir.1973)). While the Supreme Court's standing jurisprudence may not always be pellucid, the Court has left no doubt that "a mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA." *Sierra Club v. Morton,* 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972).

As the Court noted, if a special interest in a subject were enough to provide the floor for standing to a long-interested organization, there would be no objective basis for barring the same theory of standing to any other organization no matter how small or new, or to an individual with an interest in the subject matter. That the organization has made the collection and dissemination of information on a particular subject its goal in life no more gives it an injury in fact each time it cannot obtain the information it wants than would be true of any one of its members. The organization's standing can, like water, rise no higher than its members' source. That the organization cannot carry on its ordinary affairs because it cannot get the information it desires from the government no more creates injury in fact than if it were seeking government funds to which it was not otherwise entitled because it could not operate its ordinary affairs without that

funding. That could hardly be said to provide it with an injury in fact for standing purposes unless the government were under some duty to provide the funding. I see no reason why the same is not true with respect to information.

Informational standing, of course, has a legitimate origin in those areas of the law where Congress has created a right to information and an obligation on the government to furnish it, and a plaintiff, attempting to exercise that right, has been denied the same. As the majority rightly notes, "Congress may not 'create' an Article III injury that the federal judiciary would not recognize, [but] ... Congress can create a legal right ... the interference with which will create an Article III injury." Maj. Op. at 736 (citations omitted). Thus, under statutes such as FOIA, where Congress has expressly entitled citizens to certain information, the withholding of that information by the government violates that statutory right and causes the injury in fact which underlies standing. This is so despite the fact that all citizens hold the right equally and that generalized grievances do not provide the injury in fact necessary for Article III standing. *See Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 449–50, 109 S.Ct. 2558, 2564–65, 105 L.Ed.2d 377 (1989).

The logic of allowing that deprivation to constitute injury in fact despite the generalized nature of the right violated is, upon examination, inescapable. The right is generalized, but the injury is not. The injury has occurred specifically, individually, and palpably to the person who tried to exercise the right and was thwarted. If the generalized nature of a right were sufficient to make the injury suffered in the deprivation of that right nonjusticiable, then there would be no way to vindicate, for example, First Amendment rights. Thus, standing under FOIA, under FACA, *see Public Citizen, supra,* and perhaps under the FECA is not "informational" standing at all. It is standing in its most traditional form. A plaintiff brings suit to vindicate an injury to a statutorily created right. That right happens to be access to information. But that type of action is not before us here. Plaintiffs in the instant case

are not seeking to vindicate a statutorily created right.

The FEC is, as the majority makes clear, obligated under the Act to provide certain information to voters, indeed, to the population at large. If the plaintiffs had gone to the FEC seeking information that the Commission possessed and been denied it, and then jumped through the proper procedural hoops, the FEC could not credibly have argued that the plaintiffs did not have the injury in fact to make out standing. But that is not what happened. The plaintiffs did not seek access to information in the Commission's possession, but rather sought to have the Commission perform its alleged legal duty to regulate a third party—the American Israel Public Affairs Committee ("AIPAC")—in such a fashion as to cause the third party to give it the information to which the plaintiffs would then be entitled.

Although the Act contemplates citizen complaints initiating Commission investigation of violation of the Acts, 2 U.S.C. § 437g (1994), this is not to say that Congress has created a right to enforcement of the law, the violation of which constitutes an injury in fact for standing purposes. In *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), the Supreme Court reaffirmed "that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." That being the case, the Court recognized "the general unsuitability for judicial review of agency decisions to refuse enforcement." *Id.* For an injury to afford standing, it must be remediable in the action brought. As we cannot, under *Heckler*, afford a remedy for an injury consisting of no more than the generalized grievance that the Commission has failed to enforce the law, the Commission's failure to take the regulatory action of declaring AIPAC a political committee which would allegedly cause AIPAC to turn over the information to which appellants would then have access is not an injury which this court can remedy under *Heckler*.

Neither does the congressional provision affording a right to sue overcome the lack of standing. Granted, section 437g(a)(8)(A) permits any party aggrieved by the Commission's dismissal of a complaint or failure to act on such complaint to file a petition with the United States District Court for the District of Columbia. Such a statute creating a right to sue does not, however, create standing. At most, it invests a right to sue in those who otherwise have standing but would not necessarily have a clear claim to relief cognizable by a district court. The Supreme Court has clearly enunciated this concept in the analogous context of environmental litigation. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Court of Appeals had held, *inter alia*, that the citizens suit provision in 16 U.S.C. § 1540(g) provided standing. *Lujan*, 504 U.S. at 572, 112 S.Ct. at 2142–43 (citing 901 F.2d at 121–22). In reversing that holding, the Supreme Court expressly rejected the view that "the injury-in-fact requirement had been satisfied by congressional conferral upon *all* persons of an abstract, self-contained, noninstrumental 'right' to have the Executive observe the procedures required by law." 504 U.S. at 573, 112 S.Ct. at 2143. The Court recognized without difficulty that such a view rejected the consistent holding of the Supreme Court "that a plaintiff raising only a generally available grievance about government ... does not state an Article III case or controversy." *Id.* at 573–74, 112 S.Ct. at 2143. The logic of *Lujan* is no less applicable here. These plaintiffs have no statutory right, through section 437g or any other provision, to force the FEC to collect and turn over this information. In the absence of such a right, no injury—informational or otherwise—is possible. I would discard the entire notion of informational standing to the extent that it is something separate from traditional standing doctrine. Under traditional standing doctrine it is clear that these plaintiffs have stated no claim.

### B. *Redressability*

Although I have alluded above to the absence of redressability as defeating standing, I wish to make it quite express that even if the grievance of voters is not held to be too generalized to afford standing, that grievance lacks the redressability essential to an Article III injury. Both we and the Supreme

Court have repeatedly made it plain that where an injury to putative plaintiffs is "highly indirect" as to a governmental actor defendant, and " 'results from the independent action of some third party not before the court,' " it is " 'substantially more difficult to meet the minimum requirement of Art. III' " standing than in the case of a direct injury. *Allen v. Wright,* 468 U.S. 737, 757–58, 104 S.Ct. 3315, 3328, 82 L.Ed.2d 556 (1984) (quoting *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 42, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976), and *Warth v. Seldin,* 422 U.S. at 505, 95 S.Ct. at 2208).

The *Allen* Court pronounced that analysis in a discussion that began with the causation element of standing, finding the line of causation between a grant of tax exemption and the third party's offending conduct "attenuated at best." *Id.* at 757, 104 S.Ct. at 3327–28. The Court then reasoned from that attenuated causation to a conclusion that "it is entirely speculative ... whether withdrawal of a tax exemption from any particular school would lead the school to change its policies." *Id.* at 758, 104 S.Ct. at 3328. The *Simon* decision makes it even more clear that multilevel relief is not only problematic as to causation—that is to say that the independent act of a third party is rarely fairly traceable to the government's failure to regulate—but also as to redressability. In that case, the Court held that "Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the Court." *Simon,* 426 U.S. at 41–42, 96 S.Ct. at 1926. In *Simon,* in *Allen v. Wright,* in *Fulani,* the high court and this one have repeatedly held that it is too speculative to meet the redressability requirement of Article III standing to assume that an independent third-party actor would so amend its conduct to redress the wrong allegedly being done to the plaintiffs because of a court decree against the government. In those cases, admittedly, the regulatory act involved taxation. But the rationale is no different here.

In this case, no more than those, to find a lack of standing where redressability would depend on the Commission's regulation of a third party and that third party's response to the regulation is no "breathtaking attack on the legitimacy of virtually all judicial review of agency action," as the majority suggests. Maj. Op. at 738. Rather, it is only a specific application of general principles of standing jurisprudence.

Appellants' claim of redressability depends on the linked chain that the Commission will enter an order against AIPAC requiring the information plaintiffs seek, that AIPAC will comply with that order, and that appellants will still be sufficiently interested in the information thus produced that they will renew their claim on FEC to present them with that information after they jump through the procedural hoops. This, I submit, is too attenuated to provide the sort of redressability necessary to meet Article III standing.

### CONCLUSION

Because the injury plaintiffs allege is neither personal to the plaintiffs nor redressable in this action, they lack standing to bring the claim to an Article III court. I would therefore affirm the grant of summary judgment entered by the district court.